A-100,640-AR

~~WR-82,450-T~~

82,450-01

| EX PARTE | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| DAVID CLIFFORD PEDDER, Jr. | § | 128th JUDICIAL DISTRICT |
| | § | |
| | § | ORANGE COUNTY, TEXAS |

This document contains some
pages that are of poor quality
at the time of imaging.

## IN THE COURT OF CRIMINAL APPEALS

## MEMORANDUM IN SUPPORT OF FIRST AMENDED APPLICATION FOR WRIT OF HABEAS CORPUS SEEKING RELIEF FROM FINAL FELONY CONVICTION UNDER TEX. CODE CRIM. P. ART. 11.07

RECEIVED IN
COURT OF CRIMINAL APPEALS

JUN 1 ) 20¹⁵

Abel Acosta, Clerk

# RYAN W. GERTZ

ATTORNEY AT LAW
BOARD CERTIFIED CRIMINAL LAWYER
TEXAS BOARD OF LEGAL SPECIALIZATION

**THE GERTZ LAW FIRM**
2630 Liberty, Beaumont, TX 77702
p: (409) 833-6400 f: (409) 833-6401
e: rgertz@gertzadair.com

COPY

June 16, 2015

The Honorable Courtney Arkeen
Judge of the 128th District Court
Orange County
801 W. Division St.
Orange, TX 77630

RE:     David Pedder, Jr. - Memoranda in Support of Writ of Habeas Corpus

Dear Judge Arkeen,

Per your order, I have enclosed for filing a Memoranda in Support of our Writ of Habeas Corpus, accompanying exhibits and a Proposed Findings of Fact and Conclusions of Law. For your convenience, I have also provided you a flash drive containing a PDF of the Memoranda, the Exhibits and a Word version of the Findings of Fact and Conclusions of Law.

We will provide a courtesy copy of the Memoranda and the Exhibits to the District Attorney, the Court of Criminal Appeals and Bruce Smith.

If the court has any questions, please let us know.

Thanks in advance for your consideration.

Best Regards,

Ryan W. Gertz

| EX PARTE | § | IN THE DISTRICT COURT |
| --- | --- | --- |
| | § | |
| DAVID CLIFFORD PEDDER, Jr. | § | 128th JUDICIAL DISTRICT |
| | § | |
| | § | ORANGE COUNTY, TEXAS |

## IN THE COURT OF CRIMINAL APPEALS

## MEMORANDUM IN SUPPORT OF FIRST AMENDED APPLICATION FOR WRIT OF HABEAS CORPUS SEEKING RELIEF FROM FINAL FELONY CONVICTION UNDER TEX. CODE CRIM. P. ART. 11.07

TO THE HONORABLE JUDGE OF SAID COURT:

This application concerns a conviction from the 128th District Court, Orange, Texas. The Cause Number was: A100640-R. The Trial Judge was the Honorable Courtney Arkeen. Applicant was represented at trial by Bruce Smith (SBOT: 18543300). Judgment was entered on May 18, 2012 whereby Applicant was convicted of Aggravated Sexual Assault and sentenced to forty (40) years.

Applicant previously filed a *pro se* writ application to this Court, the Cause Number was No. WR-82,450-01. On January 14, 2015, the Court of Criminal Appeals, entered an order regarding evidence gathering. Applicant filed an Amended Writ on April 10, 2015. At the Court's direction and in accordance with the Rules, Applicant hereby files his Memorandum in Support of the Writ and accompanying affidavits and exhibits along with a proposed Findings of Fact and Conclusions of Law.

| EX PARTE | § | IN THE DISTRICT COURT |
| | § | |
| DAVID CLIFFORD PEDDER, Jr. | § | 128th JUDICIAL DISTRICT |
| | § | |
| | § | ORANGE COUNTY, TEXAS |

## IN THE COURT OF CRIMINAL APPEALS

## MEMORANDUM IN SUPPORT OF FIRST AMENDED APPLICATION FOR WRIT OF HABEAS CORPUS SEEKING RELIEF FROM FINAL FELONY CONVICTION UNDER TEX. CODE CRIM. P. ART. 11.07

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW David Clifford Pedder, Jr., and files this Memorandum in Support of First Amended Application for Writ of Habeas Corpus Under Tex. Code Crim. P. Art. 11.07, and in support thereof would respectfully show this Court as follows:

### I. WRIT

David Clifford Pedder, Jr. is illegally restrained of his liberty by the Texas Department of Criminal Justice pursuant to an order of conviction in Orange County, Texas. This application seeks relief from that restraint in the form of a new trial or, alternatively, a grant of an acquittal by this Court. Under Article 11.05 of the Texas Code of Criminal Procedure, this Court has the power to grant this Writ.

2

## II. SUMMARY OF RELEVANT FACTS

The alleged sexual assault occurred on a Saturday morning, May 15, 2010 at Baker's Transmission in Downtown Orange, Texas.[1] The Complaint testified that David drove her to work at Baker's Transmission on Saturdays and they would arrive before everyone else.[2] She further testified, on the day of the alleged assault, that they "were the first ones there" and that the doors were not locked upon their arrival.[3] During cross-examination she changed her story and testified that David had keys to the building.[4] The Complaint did not allege any other instance of sexual contact with David and did not allege any location other than Baker's Transmission. Furthermore, she described the location where the sexual encounter occurred as the floor of the "room with the rollout rug on it."[5] No physical evidence of any kind was presented by the State. No DNA. No semen. No blood. And, no photos of the scene or location were presented to the jury by either side.

To counter the State's case, trial counsel, Bruce Smith, could have called more than a dozen potential witnesses who would have testified to the impossibility of the Complaint's claims. Specifically, those witnesses would

---

[1] RR 4, 11-12.
[2] RR 4, 8-10.
[3] RR 4, 9-10.
[4] RR 4, 26.
[5] RR 4, 12.

3

have testified that: David did not have keys or the alarm code to open Baker's Transmission on May 15, 2010 or anytime before, the Transmission shop was never open unless a Freeman family member was present, and numerous people observed him on Saturday mornings arrive before the shop was open and sit outside and wait for someone with a key to arrive.[6] In fact, two different witnesses specifically recall seeing David sitting in his truck, on a Saturday morning in the Spring of 2010, with the Complaint waiting for the shop to open.[7] Every one of these witnesses now indicate, via their attached affidavits, that Bruce Smith did not interview them, request their testimony, or contact them at all.[8] Additionally, the impossibility of the offense was explained to Detective Keaton but those conversations were not communicated to Bruce Smith nor reflected in Detective Keaton's report.[9]

## III. SUMMARY OF THE ARGUMENT

Applicant was denied effective assistance of counsel in violation of the Sixth Amendment and clearly established federal law, specifically *Strickland v. Washington*,[10] as well as Texas law.[11] Bruce Smith failed to adequately investigate the allegations, failed to preserve error relating to

---

[6] *See Exhibits* I-L, N-W.
[7] *See* Exhibits N & S.
[8] *See* Exhibits J-L, N-W.
[9] *See Exhibits* J, L, and Y.
[10] *Strickland v. Washington*, 466 U.S. 668 (1984).
[11] *Ex Parte Patterson*, 993 S.W.2d, 114, 115 (Tex. Crim. App. 1999).

4

pertinent procedural and evidentiary matters, failed to object to inadmissible evidence, failed to effectively present a readily available defense, and generally failed to render adequate legal assistance. The totality of the ineffectiveness by Bruce Smith directly caused the conviction and the outcome of the case likely would have been different had Bruce Smith performed adequately at the guilt/innocence stage of the trial. Applicant was likewise denied effective assistance of counsel at punishment and his extremely harsh punishment was a logical result.

Additionally, Applicant is actually innocent of the crime for which he has been convicted and his punishment, therefore, violates the Eighth Amendment and the Fourteenth Amendment. Writs of habeas corpus are the proper vehicle for considering claims of actual innocence under federal and state law.[12]

Finally, Applicant was denied a fair trial as a result of exculpatory information in the possession of law enforcement being withheld from the defense in violation of *Brady v. Maryland*.[13]

---

[12] *Herrera v. Collins,* 506 U.S. 390 (1993): *Ex Parte Elizondo*, 947 S.W.2d 202, 205 (Tex. Crim. App. 1996).
[13] *Brady v. Maryland*, 373 U.S. 83 (1963).

5

## IV. BRUCE SMITH'S RESPONSE TO COURT'S ORDER FOR AFFIDAVIT EXPLANATION

On the Order of the District Court, Bruce Smith filed an affidavit purportedly answering the queries posed by the Court relating to this Writ.[14] The Court Ordered Bruce Smith to respond to the following inquires:

1. Whether Trial counsel's performance was ineffective by failing to investigate and interview six witnesses who could testify as to the impossibility of Applicant being able to gain entry into the establishment where the Complaint claimed the sexual assault had taken place.

2. Whether Trial Counsel had a trial strategy for not calling said six witnesses to testify as to the impossibility of Applicant being able to gain entry into the establishment where the Complaint claimed the sexual assault had taken place.

3. What investigation Trial Counsel did in preparation for trial.

4. What evidence was obtained by Trial Counsel in response to any discovery orders in the case or the District Attorney's open file policy.

5. Whether Trial Counsel had a trial strategy.

The affidavit filed by Bruce Smith did not adequately address the issues posed by the Court and to the extent that it did not, David Pedder objects to the Court regarding the record to be "silent" on those issues. Bruce Smith had the opportunity to describe his strategy for failing to investigate the myriad witnesses who would have described the impossibility

---

[14] *See* Exhibit H.

6

of David accessing Baker's Transmission to commit the offense. Clearly he had none.[15] Courts have consistently found there is never a strategic reason not to adequately investigate a viable defense or interview important fact witnesses – though Bruce Smith did not attempt to announce one.

The extent of Bruce Smith's "investigation" appears to have been interviews with David and his fiancé, reviewing the State's file, getting a polygraph exam for David, and preparing motions that he never filed. He alleges that he interviewed and had several conferences with Don Freeman, owner of Baker's Transmission, but Freeman's affidavit indicates that Bruce Smith failed to talk with him or meet with him until the Friday before trial.[16] As such, his alleged trial strategy of showing that the incident could not have happened because David did not have a key to Baker's Transmission was not even a viable defense for him before his first conversation with Freeman 72 hours before trial.

Noticeably, he did not indicate that he interviewed any of the other Freeman family members who run Baker's Transmission or any of the regulars who go to Baker's every Saturday morning for coffee and socializing.[17] He also failed to indicate his strategy for doing so, and the

---

[15] *Id.*
[16] *See* Exhibit I, affidavit of Don Freeman, pg. 2.
[17] *See e.g.* Exhibits N & O.

7

Court should regard that as a lack of strategy rather than the record being silent on that issue.

Finally, the most shocking revelation provided by the affidavit was the claim that "[Bruce Smith] prepared several pretrial motions on behalf of Mr. Pedder that were ready to be filed at any time." It is bad enough that he actually filed no motions on David's behalf. Sadder still, however, is that a review of the motions he drafted indicates that Bruce Smith copied and pasted them from other cases[18] and that many of them were not even relevant to David's case. For example, Bruce filed a Motion to Suppress Illegally Obtained Evidence; yet there was no physical evidence in the case, much less any indication that it was illegally obtained. This was merely a boiler-plate, irrelevant motion. When reading the motions, even a casual observer can tell that the are not tailored to the facts and issues in David's case and would have served almost no purpose. His failure to file any of them though indicates how little attention Bruce Smith actually paid to this very serious case.

---

[18] *See* Exhibit Z, Bruce Smith Motions, Motion To Suppress Illegally Obtained Evidence; listing Kenneth Fuselier as his client.

8

## V. LAW OF THE CASE AND APPLICATION TO THE FACTS AND RECORD
### 1. Ineffective Assistance of Counsel at Guilt/Innocence

The Sixth Amendment, applicable to the States through the Fourteenth Amendment, guarantees citizens accused of a crime the right to counsel in criminal prosecutions.[19] In the pioneering case *Strickland v. Washington*, the United States Supreme Court held the right to counsel means the right to effective assistance of counsel.[20] To prevail under *Strickland*, a petitioner must show that counsel's performance was both deficient and prejudicial.[21] Texas has adopted the *Strickland* test for State cases as well.[22]

To establish deficiency, the petitioner must show "counsel's representation fell below an objective standard of reasonableness."[23] Evidence of prejudice is shown by establishing a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[24] A reasonable probability is one sufficient to undermine confidence in the outcome.[25]

The Fifth Circuit agrees. "A 'reasonable probability' need not be proof by a preponderance that the result would have been different, but it

---

[19] U.S.C.A. Const. Amend. VI; *Gideon v. Wainright,* 372 U.S. 335 (1963).
[20] *See generally: Strickland,* 466 U.S. 668.
[21] *Id.* at 687.
[22] *Hernandez v. State,* 726 S.W.2d 53 (Tex. Crim. App. 1986).
[23] *Strickland,* 466 U.S. at 688; *see also Ex Parte Patterson,* 993 S.W.2d at 115.
[24] *Strickland,* 466 at 694.
[25] *Id.*

must be a showing 'sufficient to undermine confidence in the outcome.'"[26] According to the Texas Court of Criminal Appeals, *Strickland* does not "require that the appellant show there would have been a different result if counsel's performance had not been deficient."[27]

## A. Failure to Perform Pre-trial Investigation

Given that this issue relates to a fundamental constitutional right, the federal appellate courts provide great insight into what constitutes a sufficient investigation and whether harm results. Significant to this case, the Fifth Circuit has addressed failure to investigate valuable witnesses and found it to lie outside the bounds of strategy. In *Bryant v. Scott*, the court overturned a denial of habeas relief in an armed robbery case because counsel failed to interview eyewitnesses and an alibi witness.[28] In finding counsel ineffective, the court reasoned that choosing not to interview witnesses cannot be a contemplated strategy.[29]

The Fifth Circuit in *Bryant,* overturned a district court's denial of habeas relief from a state armed robbery conviction because counsel failed to interview two eyewitnesses, an alibi witness, and "restricted his pretrial

---

[26] *Williams v. Cain,* 125 F.3d 269, 279 (5th Cir.1997) (quoting *Strickland,* 466 U.S. at 694).

[27] *Andrews v. State,* 159 S.W.3d 98, 102 (Tex. Court Crim. App. 2005) (citing *Strickland,* 466 U.S. at 694).

[28] 28 F.3d 1411 (5th Cir. 1994).

[29] *Id.* at 1419.

investigation to discussions with [the defendant], review of the indictment against [the defendant], and examination of the prosecutor's file."[30] The court concluded that "information relevant to [the] defense might have been obtained through better pretrial investigation of the eyewitnesses, and a reasonable lawyer would have made some effort to investigate the eyewitnesses' testimony."[31] Interestingly, the "investigation" in *Bryant* reads almost like Bruce Smith's purported investigation in this case.

The Fifth Circuit expressly rejected the notion that "vigorous" cross-examination of witnesses at trial can "cure" counsel's failure to interview witnesses before trial. The panel pointed out that effective cross-examination "does not necessarily indicate that a reasonable lawyer, viewing the trial *ex ante,* would have regarded an interview of the eyewitnesses as unnecessary."[32] The Court also noted that even if cross-examination were effective, "that is not to say it could not have been improved by prior investigation."[33] The same is certainly true in this case.

Further, the Fifth Circuit rejected the argument that a failure to interview witnesses is excusable as "a strategic decision" if the witnesses

---

[30] *Bryant,* 28 F.3d at 1418.
[31] *Id.*
[32] *Id.* at 1419.
[33] *Id.*

11

would not have been credible.[34] Acknowledging that a lack of credibility might support a strategic decision not to call a witness to testify at trial, the court explained that a witness's character flaws cannot support a failure to investigate.[35] Without contacting a witness, much less speaking with him, counsel is "ill-equipped to assess his credibility or persuasiveness as a witness."[36]

In *Soffar v. Dretke*, the court found counsel ineffective because he failed to interview and investigate the only known eyewitness to the crime.[37] There, the eyewitness could describe the gunman but was unable to identify the accused in a photo lineup.[38] Citing *Strickland*, the court noted that the petitioner is not required to prove his innocence or demonstrate that counsel's deficiencies altered the outcome in the case by a preponderance of evidence.[39] Rather, the petitioner need only show that had defense counsel conducted an adequate pretrial investigation, there is a reasonable probability that the jury's verdict would have been different.[40] Like in *Soffar* and *Bryant*, Bruce Smith's investigation in this case was deficient and there

---

[34] *Id.*
[35] *Id.*
[36] *Id.; see also Anderson v. Johnson*, 338 F.3d 382, 392 (5th Cir. 2003) (holding that counsel's failure to investigate an eyewitness constituted deficient performance).
[37] *Soffar v. Dretke*, 368 F.3d. 441, 478 (5th Cir. 2004).
[38] *Id.* at 475.
[39] *Soffar*, 368 F.3d at 479.
[40] *Id.* (citing *Strickland* 466 U.S. at 694).

12

is a reasonable probability that a thorough investigation would have altered the jury's verdict. The shortcomings in his investigation and the myriad witnesses who would have testified on David's behalf should certainly undermine this Court's confidence in the conviction.

In this case, Bruce Smith did no real pre-trial investigation. In fact, at the Motion for New Trial hearing held within months of the guilt/innocence trial, he could not recall whether he even looked at the DA's file.[41] Obviously he did not interview pertinent witnesses provided to him by David (which will be detailed *infra*), he did not visit the scene (also addressed *infra*), and he did not interview or speak with any of the investigators in law enforcement. The affidavit submitted to the Court describing what he did conspicuously omits any of these obvious tasks.[42] His lack of preparation alone - for a first degree felony trial – should be sufficient to meet both prongs of *Strickland* based on evidence that has come to light after the trial.

Moreover, though, given the reputation of the Orange County District Attorney's Office for being dedicated to a just outcome and not merely obtaining convictions, a thorough investigation by Bruce Smith might have

---

[41] RR 7, 5.
[42] *See* Exhibit H.

13

provided him an opportunity to present the exculpatory evidence to the State and avoid the risk of a trial altogether. While not doing so might make strategic sense in Harris or Dallas counties, it makes no sense in Orange County. Absent a thorough investigation, though, there would be no way for Counsel to know of evidence – much less present it to the State – that might change the State's position on proceeding to trial in a first degree felony case.

What should have happened is simple: Bruce Smith should have obtained affidavits or witness statements from the people who have provided them in this proceeding as they show the practical impossibility of the Complaint's claims.[43] He should have visited the scene and taken pictures of location of the alleged sexual encounter to show the illogicality of the Complaint's story.[44] He should have brought those items to the District Attorney, along with the report of polygraph examiner John Swartz,[45] in an effort to have the charges dropped. Then, if that did not work, Bruce Smith would have been thoroughly prepared to present a persuasive case to the jury.

---

[43] *See Exhibits* I-L, N-W, AA-BB.
[44] *See* Exhibits A-E.
[45] *See* Exhibit G.

14

Instead, he appeared to be viewing the Complaint's statement for the first time in the midst of his cross-examination of her.[46] Worse still, he attempted to cross-examine the Complaint about the lay-out of the building, but he did not have photos or a diagram for the demonstration and ultimately lost the point that her story makes no sense.[47] In fact, he had never been to the building until the trial was underway.[48] And he never interviewed the key witnesses who could have exonerated David.[49] Additionally, during one exchange about who the outcry witness would be, Bruce Smith made clear that he had not reviewed any of the statements made by the witnesses as he misunderstood whether Sheryl Pedder had even spoken with the Complaint about the allegations.[50]

## B. Counsel Not Prepared for Trial, but Failed to Preserve Error

Bruce Smith evidently expressed to the Court that he was not ready to proceed with trial. However, he did not properly preserve potential error on that point. Courts who force a defendant to trial when counsel is unprepared do so at their peril. But, lawyers who fail to preserve this easily reversible

---

[46] RR 4, 29.
[47] RR 4, 32-34; *see* Exhibit M, diagram of Baker's Transmission.
[48] *See* Exhibit I, pg. 2.
[49] *See* Exhibits J-L, N-W, AA-BB.
[50] RR 3, 34.

15

error are patently ineffective.[51] Bruce Smith failed to did so and the result was an inept defense against an extremely serious charge.

## C. Counsel Failed to Give Opening Statement Before OR After State's Case

Experts universally find that jurors make up their minds early in a case about how they are going to vote. In fact, Dr. Donald Vinson – a renowned jury consultant - notes: "In all of our work as behavioral scientists involving pre-trial groups analysis, trial simulations, and post trial interviews, we have reached the conclusion that 80 to 90 percent of all jurors come to a decision during or immediately after the opening statements." He goes on to write: "if you have not hooked your jurors early, it may be hard to persuade them later."[52]

Bruce Smith chose not to give an opening statement either before or after the State's case in chief.[53] This omission is particularly damaging in a case where the nature of the charge likely has jurors' hackles up before hearing any evidence. It would have been a prime opportunity for Bruce

---

[51] *See e.g. Cannon v. State*, 252 S.W.3d 342 (Tex. Crim. App. 2008) (counsel consistently objects to trial proceeding as he is not ready, Court of Criminal Appeals reverses trial judge for proceeding regardless).

[52] How to Persuade Jurors, Dr. Donald Vinson; ABA Journal The Lawyers Magazine, 2014. *See* http://www.vinsoncompany.com/pdf/How to Persuade Jurors.pdf.

[53] RR 3, 10; RR 4, 40, 47.

16

Smith to frame the case in a way that impacted the outcome. And, it would not need to be long or complicated.

For example, he could have opened with: "The facts in this case boil down to one key piece of evidence: David Pedder did not have access to the building where Alahna says this crime occurred, when she says it occurred. David didn't have a key to Baker's Transmission so he could not have been alone with Alahna to have sex with her on May 15, 2010. When listening to the evidence, nothing else matters except for the fact that the State's version of events is impossible."

Of course, making such an opening statement would require trial preparation – interviewing witnesses, understanding the statements made by the Complaint, understanding the shortcomings of the State's witness statements, and visiting the scene of the offense. Bruce Smith did none of these things,[54] so the lack of an opening statement prior to the evidence can be explained, not by strategy, but by lack of preparedness. Again, Bruce Smith was asked by the Court to detail his trial strategy (the lack of an opening was raised by the Writ) and he provided none.

---

[54] The best evidence of this is his own Affidavit, Exhibit H, but its also seen throughout the trial testimony and presentation.

17

While some courts have found that there may be a strategic reason for waiving opening prior to the State's case, there is no conceivable strategic reason to waive it after the State has rested. In this case, though, the resulting harm was that a full day of testimony was presented and none of the jurors had heard anything of value from the accused. As a practical result, the jury had a significant amount of time to formulate an opinion as to David's guilt before hearing anything from the Defense. That is diametrically opposite of the approach outlined by Dr. Vinson and Bruce Smith offers no strategic reason for failing to provide an opening statement.

## D. Bruce Smith Failed to Adequately Cross-Examine Witnesses

Bruce Smith also failed to adequately cross-examine any of the witnesses. In fact, the record reflects only 15 pages of cross examination on Day 1 of trial (out of 129 total pages) despite the State calling seven witnesses.[55] Most glaringly, though, Bruce Smith provided no cross examination of the State's SANE nurse expert witness and an extremely limited cross-examination of the chief investigator in the case.

One line of cross-examination that was not raised was the physical evidence in support of the Complaint's claims: there was none. If the facts

---

[55] *See generally* RR 3.

18

were as the Complaint alleged to the investigators and the SANE nurse, why was there no physical evidence gathered from the girl or from Baker's Transmission? Particularly, if this truly were her first time to have sex,[56] it happened on the rollout rug,[57] and David ejaculated on the carpet,[58] there should have been evidence gathered for the purposes of DNA analysis. It would not have been hard to obtain.

Yet, Bruce Smith failed to cross examine Detective Keaton about the lack of blood or semen evidence that a thorough investigator would have obtained. The State alone is required to prove its case beyond a reasonable doubt. This line of cross-examination would have provided a great avenue for demonstrating the State's complete reliance on the word of a twelve year old. There is no strategic rationale for avoiding this line of questioning. It merely reflects poor performance and preparation.

### E. Counsel Failed to Present Witnesses to Show Impossibility of Complaint's Story

Bruce Smith did not present the witnesses described in the attached affidavits, who could have shown the impossibility of the Complaint's story.

---

[56] *See* Det. Keaton Supplemental Narrative, Exhibit Y, pg. 6.
[57] *See* RR 4, 12 & 26.
[58] *See* SANE Nurse Report, Exhibit X, 3.

interviewed by Bruce Smith.[62] Some highlights include the testimony of Beverly, Jeff, and Greg Freeman who all agree that David did not have a key to the shop on May 15th or before.[63] In fact, they all would have testified that they had a meeting and agreed to give a key to David after June 2nd, once the allegations had arisen and he was being harassed.[64]

Other witnesses, Gerald Thomas and Quincy Procell, specifically remember seeing David sitting outside the shop in his truck with the Complaint in the Spring of 2010 because he was waiting for a Freeman to arrive with the key.[65] Randy Becker, a Saturday regular at Baker's Transmission – for coffee and drag racing talk – recalls years of finding David sitting out front of the shop on Saturdays waiting for a Freeman to arrive because "we had no way to get in."[66] Don Freeman's brother in law, Larry Haywood, worked for and lived with the Freemans for four years, yet he would have testified that he was never given a key to the shop."[67] David's grandfather, Leonard Hutton, who was never contacted by Bruce Smith, would have testified that he would go by Baker's Transmission shop on Saturdays and "Dave would be waiting on Don Freeman, the owner to

---

[62] *See* Exhibits J-L, N-W, AA-BB.
[63] *See* Exhibits J, K, & L.
[64] *Id.*
[65] *See* Exhibits N & S.
[66] *See* Exhibit O.
[67] *See* Exhibit P.

arrive."[68] More specifically, he would note, David did not have a key to the building.[69] David's daughter Latisa agrees, stating "he didn't have the keys to the shop, we had to wait on his boss to arrive to open the doors to the shop."[70]

Of most particular interest to the defense, however, would have been the testimony of witnesses who are not close to or friends with David. For example, a businessman from Louisiana named Dan Weaver. Dan's company uses Baker's Transmission for repairs and has arrived earlier than the shop opened for appointments. Weaver indicates "Don was always the person who had to unlock the door and I would wait to enter the building until after Don had deactivated the building's alarm."[71] Eric Wolfford, who works on the vehicles for the city of Orange, who would have testified that one or more family members is always at the shop when the doors are open.[72]

Kenny Pigg provides another example. In his affidavit Pigg writes: "I have been by Baker's Transmission on many occasions. I have been by when they were closed and when they were opened. In all the years that I

---

[68] *See* Exhibit Q.
[69] *See* Exhibit Q.
[70] *See* Exhibit U.
[71] *See* Exhibit T.
[72] *See* Exhibit BB.

22

have been doing business and friends with this group, I have never been by there when the shop was opened without one of the family members being present."[73] Likewise, Leroy Perkins, who hauls scrap metal from Baker's on a regular basis, indicates: "I have never been by the shop during business hours when there was not at least on family member present and there was almost always more than one family member present."[74] He continues: "I have also been to Baker's Transmission on several occasions, in the morning, when there were employees in the parking lot waiting for waiting for Don Freeman or one of the family members to come and open the business."[75]

Even the Orange County Sherriff, Keith Merritt, provided an affidavit, albeit under subpoena from Writ Counsel, indicating the same testimony as all the others: only the Freeman family members had keys to the Baker's Transmission shop.[76] Plus, the Sherriff adds: "I have never been by the shop and seen it open and only Dave there."[77] And another prominent citizen, Dr. Robert Marroquin, would have told jurors: "It is my firm belief that unless

[73] *See* Exhibit V.
[74] *See* Exhibit AA.
[75] *Id.*
[76] *See* Exhibit W.
[77] *Id.*

23

there is a Freeman family member present, the business is closed and locked."[78]

According to Bruce Smith's affidavit for this Writ, his strategy in this case boiled down to the fact that David did not have a key to the building.[79] Yet, he failed to call numerous available witnesses to make the point. And, if that were not enough, he bungled his attempt to implement his lone trial strategy.

### F. Counsel's Bungled his Only Attempt at Presenting Exculpatory Evidence

The Complaint testified at trial that when she and David arrived at Baker's Transmission, the door to the business was open and yet no one was there.[80] This is a patently ridiculous claim – given the location of the business and the value of its contents of the shop – and it could have easily been refuted by the Freeman family and a variety of other witnesses. Bruce Smith failed to interview or call any of them. For example, Greg Freeman indicates that "we have never left the doors to our building unlocked

---

[78] *See* Exhibit CC.
[79] *See* Exhibit H.
[80] RR 4, 8-10.

24

overnight as we have hundreds of thousands of dollars worth of equipment, tools, and vehicles in our facility."[81]

Instead of taking advantage of this massive defect in her testimony, however, Bruce Smith fumbled the opportunity. She had testified that the doors were simply open; but Bruce Smith chose to correct her and encourage her to change her story and say that David had a key rather than the door simply being left open overnight.[82] This, of course, is where the lack of preparation bears its poisonous fruit.

In the wake of the allegations, William "BJ" Bishop and other family members of the Complaint began harassing David at his home and place of work. So much so that the Freeman family had a meeting and decided to give David a key and the alarm code so he could hide out there rather than endure continued harassment at his home.[83] The Freeman's could have testified that they clearly remember when they gave him a key because it was right after they called the police on BJ Bishop for threatening them at the shop.[84] That was weeks after the alleged incident would have occurred. As such, he could have made clear from evidence that David did not have a

---

[81] *See* Exhibit K.
[82] RR 4, 26.
[83] *See* Affidavits of Freeman family, Exhibits I-L.
[84] *See* Exhibit F, Police Report.

key on May 15, 2010. Frankly, though, given the nature and date of the allegations, the fact that David got a key after the allegations arose should not have been admissible under Texas Rule of Evidence 402 (in that it does not make a fact at issue more or less probable) and under Rule 403 (that it is unfairly prejudicial and that prejudice outweighs its probative value – which is none).

Bruce Smith only presented Don Freeman to try to make this point and he did so clumsily. His line of questioning with Freeman actually diminished the defense and then opened the door to damaging and irrelevant evidence. In fact, right off the bat, Bruce Smith asked Freeman: "did you give [David] keys to the business?" and he answered affirmatively.[85] Bruce Smith went on to try to fix the damage by asking when the key was given and about May 15th, but the damage was done. Certainly there were jurors who heard that David had a key and the whole defense went right out the window for them.

Had he been prepared properly, the proper line of questioning would never have even addressed giving him a key after May 15th, because that was not relevant. The only material question was whether or not David had a

---

[85] RR 4, 49.

26

key on May 15th. It is reasonably probable that some or all of the jurors heard that David had a key and did not listen to the rest of the questions relating to the key.

Further, though, by only calling one witness to make the point, Bruce Smith limited the value of the point. An effective attorney would have brought in a parade of witnesses to illustrate the importance of the key rather than hoping jurors heard it the one time it was asked during a two day trial.[86] Had three other family members, two witnesses who had seen David with the Complaint waiting to enter the shop on a Saturday, and a parade of regulars been called to the stand, the landscape of the testimony would have been dramatically different.[87]

Additionally, however, by bungling the direct examination and bringing up all the information about why David obtained a key in June, Bruce inadvertently opened the door to a host of damaging information about David's suicide attempts and the letters he left.[88] While the letters themselves are not of particular harm, the whole suicide conversation deviates from the key point Bruce Smith should have been trying to make: that David did not have a key on May 15, 2010.

---

[86] *See* Exhibits J-L, N-W.
[87] *See* Exhibits J-L, N-W.
[88] RR 4, 63.

27

## G. Counsel Failed to Object to an Array of "Outcry" Testimony

Bruce Smith did not file or preserve the proper objections under *Crawford* or Texas Code of Criminal Procedure 38.072 to prevent testimony that was obviously inadmissible. The Texas Rules of Evidence limit the admissibility of hearsay unless it falls into one of the exceptions in Rules of Evidence 803 or 804, or it is specifically allowed "by other rules prescribed pursuant to statutory authority."[89] One of these "other rules" is Article 38.072 of the Code of Criminal Procedure. When a defendant is charged with certain offenses against a child under the age of 14 or a disabled individual, Article 38.072 allows evidence of the Complaint's out-of-court statement so long as that statement is a description of the offense and it is offered into evidence by the first adult the Complaint told of the offense.[90] Though the terms do not appear in the statute, the victim's out-of-court statement is commonly known as an "outcry," and an adult who testifies about the outcry is commonly known as an "outcry witness." Only one outcry witness may testify per single alleged event.[91]

Article 38.072 has additional requirements that must be met before an outcry witness may testify. At least 14 days before the trial on the merits

---

[89] Tex. R. Evid. 802
[90] Tex. Code Crim. P. Article 38.072.
[91] *Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim App. 2011).

28

begins, the State must notify the defendant of its intention to call an outcry witness, who must be identified. The State must provide a summary of the outcry statement that will be offered into evidence.[92] Outside the presence of the jury, the trial court must hold a hearing to determine, "based on the time, content, and circumstances of the statement" whether the complainant's out-of-court statement is "reliable."[93] Finally, the complainant must either testify, or be available to testify, "at the proceeding in court or in any other manner provided by law."[94]

Bruce Smith did not file a motion to limit hearsay recitations of the events, did not make the State follow these rules, and, as a result, a plethora of hearsay evidence regarding the Complaint's claims was admitted into evidence. For example, Officer Cowart was not the outcry witness, but his testimony about what the Complaint said was admitted without objection.[95] Then, when Bruce Smith finally realized what was happening, the Court asked counsel to approach and the State seemed to elect Cowart as their outcry witness.[96] But later, when Bailey Chaloupka testified, Bruce Smith failed to object to her hearsay recitation even though Cowart had already

---

[92] Tex. Code Crim Proc. art. 38.072 § 2(b)(1).
[93] *Id.*, at § 2(b)(2).
[94] *Id.*, at § 2(b)(3).
[95] RR 3, 30.
[96] RR 3, 34.

29

expressed the outcry testimony.[97] Similar hearsay testimony from the SANE nurse was likewise admitted without objection.[98]

Additionally, Bailey's testimony appears to be driven by a hearsay statement that David confessed to Sheryl Pedder that he molested the Complaint.[99] It is of paramount importance to this case that David never confessed and that Sheryl never testified that he did. In fact just the opposite.[100] Regardless, this outrageously damaging hearsay statement went without objection from Bruce Smith.

Regardless of the exchange with the Court and the State, the shortcoming of Bruce Smith's representation was his failure to file the motions in advance and force the State to elect a witness and specify what their testimony would be. This serves no strategic purpose. In fact, it only serves a key goal of the State: to bolster the testimony of their Complaint when they have no physical evidence to support their case.

---

[97] RR 3, 122-124.
[98] RR 4, 39.
[99] RR 3, 122.
[100] *See* RR 3, 92; Sheryl testifying that David denies anything happening with the Complaint – not admitting it.

## H. Bruce Smith Failed to Present Photographic and Demonstrative Evidence

Bruce Smith failed to present photographic exhibits of the scene and, according to the Freemans, never contacted them or visited Baker Transmission prior to trial.[101] Such evidence would have demonstrated the Complaint's story was far-fetched at best. The photos in Exhibit A illustrate that the business is locked with a deadbolt on both sides of the entrance, that there is an alarm system connected to the door, and that the alarm has motion detection. The photos in Exhibit B show where the Complaint alleges the incident occurred. By showing the jury the "rug" she describes, and the surrounding area, Bruce Smith could have shown the jury that its an unwieldy, awkward, and unclean place to lay down on the floor and have sex.[102] Additionally, though, Exhibit C illustrates the other key shortcoming of the Complaint's story: the entire area she describes is surrounded by glass. Exhibits C-1 and C-2 show the see-thru bay doors, that look directly into the double glass doors of the "building room" shown in Exhibit C-4, and the window right over the "rug" can be seen in B-4. In other words, they show that the location the Complaint alleges is not obscured from the view of someone outside the shop or in the bay area. The diagram of the

---

[101] *See* Exhibits I-L.
[102] *See* Exhibit B-2, B-3.

31

building in Exhibit M would have provided context for these arguments as well. Armed with the photos and the diagram, Bruce Smith could have efficiently and effectively chipped away at the believability of the Complaint's story. He failed to do so.

Furthermore, adding to the failure, Exhibit D photos illustrate the office at Baker's. The office has a couch, no tools or grease, and tinted windows that one can see out of but not into.[103] Bruce Smith could have used those photos to show that, had David wanted to have sex with someone at Baker's, the office would have been the obvious place to do it. It would improve the comfort and cleanliness of the situation all the while making it less likely to get caught. A thorough investigation and preparation might have allowed Bruce Smith to avail himself of such an argument, but he did not perform such an investigation.

## I. Bruce Smith Failed to File Pre-trial Motions in Limine or Notice Demands Regarding 404(b) Evidence

Bruce Smith failed to file a request under Rule 404(b) to determine other crimes, wrongs, or acts the State was intending to use at trial. He also failed to file a motion in limine to limit character evidence, irrelevant evidence, and prejudicial evidence that should have been foreseeable based

---

[103] *See* Exhibit I.

32

on the statements of the State's witnesses. And, as a result, the State presented damaging character evidence and hearsay that was not objected to. Had Bruce Smith been prepared and done a thorough investigation, he would have filed motions in limine under Texas Rules of Evidence 402, 403, and 404(b) regarding a great deal of the State's evidence. He did not.

Instead, the jury heard (without objection) evidence about David asking out his neighbors wife,[104] that his wife Sheryl called him a child molester,[105] that Detective Keaton was able to determine David's truthfulness based on his demeanor,[106] that William Bishop – in contrast – seemed truthful in his denials,[107] evidence about David's suicide attempts,[108] conversations between Sheryl Pedder and Detective Keaton,[109] and the hearsay allegation that David might have had and deleted nude pictures of the Complaint on his phone.[110] While perhaps not individually devastating, taken as a whole these evidentiary oversights clearly jaundiced the jurors

---

[104] RR 3, 14.
[105] RR 3, 17 (Officer Cobb) & RR 3, 26 (Officer Cowart).
[106] RR 3, 53-54.
[107] RR 3, 54-55.
[108] *See generally* RR 3, 56-59; and specifically on 56: hearsay statement "Mrs. Pedder had stated that she thought that David Pedder was suicidal and that he had left some notes."
[109] RR 3, 69-70.
[110] RR 3, 112.

eyes against David. When Bruce Smith failed to put on an effective defense, these failures virtually guaranteed a conviction.

## J. Conclusion

Bruce Smith's performance clearly meets the first prong of *Strickland* given the totality of the ineffectiveness of his representation of David Pedder. But, given that Counsel's unpreparedness was directly correlated to significant damaging evidence being admitted while presenting limited exculpatory evidence, the outcome of the case likely would have been different had David had effective counsel. All together though, the errors and omissions by counsel – when viewed in light of the defense available to him - must undermine confidence in the verdict. As such, at the very least, justice requires a new trial for David Pedder.

## 2. Ineffective Assistance at Punishment

In *Wiggins v. Smith*, the U.S. Supreme Court held that counsel "fell short of ... professional standards" for not expanding pre-trial investigation beyond the presentence report and one set of records they obtained, particularly "in light of what counsel actually discovered" in the

34

records.[111]   More recently, in *Porter v. McCollum,* the United States Supreme Court found a defendant received ineffective assistance of counsel where trial counsel did not even take the first step of interviewing witnesses or requesting records pertinent to the defendant's background, mental history, military service and other mitigating factors.[112] Beyond that, like in *Wiggins,* trial counsel in *Porter* ignored pertinent avenues for investigation of which he should have been aware.[113] The deficiency of counsel was glaring given the facts and the Court found the state court's conclusion that the outcome of the case would not have been different had the information been revealed "objectively unreasonable."[114]

Even with a month to prepare and knowing that the punishment range was 5-99 or life, Bruce Smith put on virtually no mitigation evidence of value at the sentencing phase. Had Bruce Smith prepared in the least for the sentencing hearing, evidence available now indicates he might have put on a persuasive case for a dramatically lower sentence than the forty years given him by the Court.

---

[111] 539 U.S. 510, 524, 525 (2003)
[112] 558 U.S. 30 (2009).
[113] *Porter,* 558 U.S. at 40.
[114] *Id.* at 30.

Mitigation cases typically take two forms: either the convicted person has had substantial hardship in his life and the Court should consider that as a reason to reduce his sentence or the person is otherwise an exemplary citizen and the incident was an isolated error in judgment or not consistent with his character. The latter form can be done while meekly disagreeing with the jurors' verdict. On the other hand, one way to virtually guarantee a substantial sentence is to attempt to re-try guilt/innocence at the punishment phase. That is precisely what Bruce Smith did here.

The record indicates all of his witnesses were called to re-hash the impossibility of the crime – an effort that Bruce Smith failed to effectively undertake at guilt/innocence. Remarkably, though, Bruce Smith had information at his fingertips that would have addressed either of the effective mechanisms for mitigation in punishment; and possibly both.

David Pedder had a difficult life growing up.[115] His father was killed when he was very young by his mother's boyfriend.[116] As a result, David was forced to move in with his grandfather who was a grave digger. According to Don Freeman, those experiences had a significant and negative

---

[115] While witnesses could have been called to detail this, Smith, at least, should have been aware of these issues because a number of them were reflected in the Court's Pre-Sentence Report made a part of the record.

[116] *See* Exhibit I, Freeman Affidavit, pg. 5.

impact of David's upbringing.[117] In addition to that, the financial impacts of his family life required him to quit school at age sixteen and go to work. He has also battled depression his whole life and had a wife who committed suicide.[118]

Other witnesses would have testified to David's positive qualities in an effort at mitigation. For example, Beverly Freeman writes: "I love Dave. He was my favorite of all our employees that we have had. He is quiet, soft-spoken, and got along really well with all of us."[119] Another past employer, Kirby Procell, describes David as "reliable, productive, and honest."[120] Kirby's brother Quincy Procell calls David "the best and most qualified mechanic that ever worked for me."[121]

This type of testimony would have put a human face on a person convicted by the jury of a very serious crime. Bruce Smith failed to investigate these avenues and certainly failed to present the testimony to the Court. The decision to do so could not possibly be considered within the bounds of strategy – such a conclusion is "objectively unreasonable"[122] – but

---

[117] *See* Exhibit I, Freeman Affidavit, pg. 5.
[118] *See* Exhibit I, Freeman Affidavit, pg. 5.
[119] *See* Exhibit J, Beverly Freeman Affidavit, pg. 1.
[120] *See* Exhibit R.
[121] *See* Exhibit S.
[122] *Porter*, 558 U.S. at 30.

37

also likely would have impacted the Court's decision making as to punishment. While David maintains his innocence and believes effective counsel would have altered the outcome at guilt/innocence, Bruce Smith's failings at punishment are likewise unjust and David ought to be entitled to a new trial or, at the absolute least, different sentence.

### 3. Actual Innocence

Applicant would submit to the Court that the evidence reflected in the attached affidavits, coupled with the lack of physical evidence to support the allegations, indicate that the crime alleged did not occur. As such, David would ask the Court to rule in his favor under *Herrera* and *Ex Parte Collins*.[123] *Herrera* claims involve a bare-bones claim of actual innocence. To prevail, David must show by clear and convincing evidence that, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence.[124] While difficult, the overwhelming evidence of impossibility and the illogicality of the Complainant's story, when paired with the lack of physical evidence warrant relief under *Herrera*.

---

[123] *Herrera v. Collins*, 506 U.S. 390 (1993): *Ex Parte Elizondo*, 947 S.W.2d 202, 205 (Tex. Crim. App. 1996).
[124] *Ex parte Tuley*, 109 S.W.3d 388, 392 (Tex.Crim.App. 2002).

38

## 4. The State had Exculpatory Evidence in its Possession that it Withheld in Violation of *Brady*

Detective Keaton was the lead investigator in this case. He interviewed Don, Beverly, Jeff, and Greg Freeman at the Baker's Transmission shop.[125] His report, however, which was part of the DA's file, does not reflect those interviews.[126] Instead, it merely indicates a meeting with Don Freeman – not his wife or sons.[127] Moreover, though, it does not indicate that the Freemans's disputed the notion of the doors being left unlocked,[128] that Freemans's disputed the notion that Don was late for work on a Saturday,[129] that David was always early to work and did not have a key,[130] or that anyone had ever seen the Complaint and David together in the shop before anyone arrived.[131] How could an experienced Detective fail to ask the question of these four: "have you ever arrived at the shop and found David and the Complaint already inside?" Someone wanting to do justice

---

[125] *See* Exhibits I-L.
[126] *See* Exhibit Y.
[127] *Id.*
[128] *See* Exhibit J, Beverly Freeman's affidavit ("we never leave our doors unlocked and no one else can open them.").
[129] *See* Exhibit J, K, & L.
[130] *See* Exhibit K, Greg Freeman's affidavit ("On several occasions I cam to the shop on Saturday to work on my race car and Dave and [the Complaint] were in Dave's truck waiting for someone to open up.").
[131] *See* Exhibit Y.

39

and get the truth asks the right questions and takes careful notes of and reports the answers. Detective Keaton did neither.

The United States Supreme Court's landmark decision in *Brady v. Maryland*, addressed the issue of the State suppression of evidence favorable to the defense. The Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[132] To establish a claim under *Brady,* a habeas applicant must demonstrate that:

> (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith;
>
> (2) the withheld evidence is favorable to him; [and]
>
> (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different.[133]

An Applicant must initially show that the State failed to disclose evidence "which had been known to the prosecution but unknown to the defense."[134] Even if the prosecutor was not personally aware of the

---

[132] *Brady,* 373 U.S. at 87.
[133] *Hampton v. State,* 86 S.W.3d 603, 612 (Tex.Crim.App.2002).
[134] *United States v. Agurs,* 427 U.S. 97, 103 (1976).

evidence, the State is not relieved of its duty to disclose because "the State" includes, in addition to the prosecutor, other lawyers and employees in his office and members of law enforcement connected to the investigation and prosecution of the case.[135]

Here it appears that Detective Keaton selectively included items in his report relating to his interview with the Freemans. In fact, it appears he either did not ask or did not care whether David had a key, the alarm code, or other means of entering the shop with no one else present. That would be a critical piece of information. He also did not search the scene to determine if physical evidence were present.

He certainly did not include the fact that Greg, Jeff, and Beverly were all present and answered questions related to the allegations. Yet each of their affidavits make clear that they would have provided favorable evidence to David's defense. Yet, after speaking with them, he failed to even note they were present, much less indicate what they said.

If it becomes the State's position that Bruce Smith failed to properly request the *Brady* material, that would be another failure indicating the

---

[135] *Kyles v. Whitley,* 514 U.S. 419, 437 (1995); *Ex parte Reed,* 271 S.W.3d 698, 726 (Tex. Crim.App.2008).

ineffectiveness of the counsel David received. For that reason, amongst the many others, David should receive a new trial.

If the State were to contend, however, that this information should have been known to Bruce Smith- through a diligent investigation that obviously did not occur - that further bolsters David's claims regarding Bruce Smith's categorical ineffectiveness. To meet the *Brady* elements though, David need only show that the State failed to disclose favorable evidence and that it was material. This evidence certainly was and would have impacted the jury's decision at trial.

## V. CONCLUSION

The evidence is overwhelming that Bruce Smith failed to provide adequate counsel. Both the nature and extent of his errors and omissions should give the Court grave concerns about the outcome of the trial. Plus, the fact that Detective Keaton failed to record, submit, or provide to counsel the exculpatory statements of the Freeman family indicate a serious *Brady* violation.

Perhaps, in lieu of conceding *Brady* level suppression by the Orange Police Department, the State will simply agree to a finding of ineffective assistance of counsel by Bruce Smith and agree that a new trial is warranted. If the State feels, based on the evidence provided herein, that it could prevail

42

in a new trial, then they will suffer no harm by having one. On the other hand, if the State acknowledges, as it should, that the outcome of this case would likely be different with effective counsel, then David is entitled, under Texas and Federal law, to a new trial.

## VI. PRAYER

WHEREFORE, PREMISES CONSIDERED, Applicant prays that the Court grant and issue a Writ of Habeas Corpus to the Sheriff of Orange County, Texas, then and there to show cause, if any there be, why Applicant should not be discharged from such illegal restraint. Applicant further requests this Court, after receiving evidence, to grant Applicant any relief to which he may be entitled and issue findings of fact and conclusions of law.

Respectfully submitted,

THE GERTZ LAW FIRM
2630 Liberty St.
Beaumont, Texas 77702
Tel: (409) 833-6400
Fax: (409) 833-6401

By:_____
    Ryan W. Gertz
    State Bar No. 24048489
    Attorney for David Pedder, Jr.

43

## CERTIFICATE OF SERVICE

This is to certify that on June 16, 2015, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, Orange County, Texas.

_____
Ryan W. Gertz, Gertz Law Firm
Attorney for David Pedder, Jr.


## CERTIFICATE OF COMPLIANCE

This is to certify that the Memorandum accompanying the Amended Writ of Habeas Corpus in the foregoing matter is less than fifty pages in length and contains 9,118 words in compliance with the Rules.

_____
Ryan W. Gertz, Gertz Law Firm
Attorney for David Pedder, Jr.

44

PEDDER EXHIBIT LIST

Exhibit A – Photos of door locks and alarms

Exhibit B – Photos of the building room

Exhibit C – Photos of doors and windows into the building room

Exhibit D – Photos of the office

Exhibit E – Photos of the bathroom

Exhibit F – Police Report re Baker's and BJ Holden

Exhibit G – Polygraph test results

Exhibit H – Bruce Smith Affidavit to the Court

Exhibit I – Don Freeman Affidavit

Exhibit J – Beverly Freeman Affidavit

Exhibit K – Greg Freeman Affidavit

Exhibit L – Jeff Freeman Affidavit

Exhibit M – Diagram of Baker's Transmission

Exhibit N – Gerald Thomas Affidavit

Exhibit O – Randy Becker Affidavit

Exhibit P – Larry Haywood Affidavit

Exhibit Q – Leonard Hutton Affidavit

Exhibit R – Kirby Procell Affidavit

Exhibit S – Quincy Procell Affidavit

Exhibit T – Daniel Weaver Affidavit

Exhibit U – Latisa Pedder Affidavit

Exhibit V – Kenneth Pigg Affidavit

Exhibit W – Keith Merritt Affidavit

Exhibit X – Sexual Assault Examination & Forensic Report Form

Exhibit Y – Detective Keaton's Report

Exhibit Z – Bruce Smith's unfiled motions

Exhibit AA – Leroy Perkins Affidavit

Exhibit BB – Eric Wolfford Affidavit

Exhibit CC – Dr. Robert Marroquin Affidavit

A




EXHIBIT

A-1

PENGAD-Bayonne, N.J.



EXHIBIT

A-2

PENGAD-Bayonne, N.J.



EXHIBIT

A-3

PENGAD-Bayonne, N.J.



EXHIBIT

A-4

PENGAD-Bayonne, N.J.



EXHIBIT

A-5

PENGAD-Bayonne, N.J.



EXHIBIT

A-6

PENGAD-Bayonne, N.J.

B



EXHIBIT
B-1

PENGAD-Bayonne, N.J.

EXHIBIT
B-2

PENGAD-Bayonne, N.J.



EXHIBIT

B-3

PENGAD-Bayonne, N.J.



EXHIBIT

B-4

PENGAD-Bayonne, N.J.

EXHIBIT

C-1

PENGAD-Bayonne, N.J.

EXHIBIT

C-2

PENGAD-Bayonne, N.J.



EXHIBIT

C-3

PENGAD-Bayonne, N.J.



EXHIBIT

C-4

PENGAD-Bayonne, N.J.

ρ



EXHIBIT
D-1
PENGAD-Bayonne, N.J.



EXHIBIT
D-2
PENGAD-Bayonne, N.J.



EXHIBIT

D-3

PENGAD-Bayonne, N.J.

3



EXHIBIT

E-1

PENGAD-Bayonne, N.J.

EXHIBIT

E-2

PENGAD-Bayonne, N.J.



**EXHIBIT**

E-3

PENGAD-Bayonne, N.J.

# Detailed Report - Call #1013413

## Call Detail

| Call Date | Address | | | Apt | Zip | Mile Post |
|-----------|---------|---|---|-----|-----|-----------|
| 06/02/2010 12:29:46 | 404 green bakers transmission | | | | | |

| City, State (County) | SubGrid - Grid (District) | Dispo of Call |
|----------------------|---------------------------|---------------|
| orange | 10th st. east / Park st. south | CLEARED NO REPORT |

| Call Type | Priority | How Reported | CallTaker |
|-----------|----------|--------------|-----------|
| DISTURBANCE | 0 | PHONE | meltonk |

## Involved Information

| Last Name | First Name | Middle | Phone | Address | Apt | City | ST | DOB | Inv Type |
|-----------|-----------|--------|-------|---------|-----|------|----|----|----------|
| freeman | beverly | | | bakers | | | | | |

## Units Dispatched to Call    (☆ = Primary Unit)

| Unit | Activity | Started | Ended | Time | Location |
|------|----------|---------|-------|------|----------|
| 409 | | 06/02/2010 12:30:51 | 06/02/2010 12:50:02 | 19:18 | |
| | DISPATCHED | 06/02/2010 12:30:51 | 06/02/2010 12:31:11 | 0.33 | |
| | ENROUTE | 06/02/2010 12:31:12 | 06/02/2010 12:31:15 | 0.05 | |
| | ARRIVED | 06/02/2010 12:31:15 | 06/02/2010 12:50:02 | 18.78 | |
| | CLEARED | 06/02/2010 12:50:02 | 06/02/2010 12:50:02 | 0.00 | |
| 457 | | 06/02/2010 12:30:46 | 06/02/2010 12:50:11 | 19:42 | |
| | DISPATCHED | 06/02/2010 12:30:46 | 06/02/2010 12:31:11 | 0.42 | |
| | ARRIVED | 06/02/2010 12:31:11 | 06/02/2010 12:50:11 | 19.00 | |
| | CLEARED | 06/02/2010 12:50:11 | 06/02/2010 12:50:11 | 0.00 | |

## Call Notes

**06/02/2010 12:29:46    (meltonk)**

issued by don freeman 6/2/2010 12:52:30 PM

trespass Issued to both subjects 6/2/2010 12:49:53 PM

409/ ck: holden, christina 10-29-86 6/2/2010 12:37:32 PM

457  SEARCH ON BISHOP,WILLIAM,19801023        NAME: BISHOP, WILLIAM, FRANK, II DESCRIPTION:
WHITE\MALE\10231980\5-07\180\RED\BLUE    SEX OFF: N COMM IMPED: N ORGAN DONOR:   VISA EXP: PHYSICAL ADD: 512 S
44TH ST CI/CO/ST/ZIP: ORANGE,ORANGE,TEXAS,77630-0000 MAILING ADD: 512 S 44TH ST   CI/ST/ZIP:
ORANGE,TEXAS,77630-0000  REC STATUS: ELIGIBLE ADMIN STATUS:  CARD STATUS: HME THR ASMT:           EXP:    CARD
TYPE: DL #: 16939037 CLASS: C  TYPE: DL  EXPIR DATE: 10232010 6/2/2010 12:34:04 PM

457/ w/m bishop , william ii  10-23-80 6/2/2010 12:32:36 PM

david pedder on scene, rp apprehensive to speak 6/2/2010 12:31:52 PM

EXHIBIT

6

# JOHN SWARTZ POLYGRAPH SERVICE

Criminal Polygraph Examiner

Former Federal Examiner
United States Dept of Justice

February 21, 2011

Mr. Bruce Smith
Attorney at Law
2914 Eastex Fwy
Suite 102
Beaumont, Texas 77703

## REPORT OF POLYGRAPH EXAMINATION

EXAMINEE:     David Clifford Pedder
EXAM DATE:   February 21, 2011
EXAM TYPE:    Specific Issue-Aggravated Sexual Assault of a Child

### SYNOPSIS:

On February 21, 2011 Mr. David Clifford Pedder was administered a specific issue polygraph examination regarding the instant offense for which is he charged: Aggravated Sexual Assault of a Child in Orange County, Texas in 2011. Mr. Pedder is represented by his attorney, Mr. Bruce Smith, of Beaumont, who has requested this examination.

### PRE-TEST INTERVIEW:

Prior to initiating the pre-test interview, Mr. Pedder was advised that a polygraph examination in Texas is voluntary and that he would be requested to read and sign a release, giving this examiner permission to proceed with the interview and examination. He was also advised that by signing the release, he was authorizing distribution of this report to his attorney only. He read and signed the release and the interview began at 9:15 a.m.

Mr. Pedder appeared alert, on-time and properly oriented for his examination. He identified himself with Texas Driver License # 09635826. He resides at 8872 Tulane, Orange, Texas.

Mr. Pedder stated he was born on January 23, 1963 at West Morlan, Pennsylvania. He is forty eight years old. He was raised in Orange where he attended high school through the tenth grade. He has no further higher education or military experience.

His father is deceased. His mother lives in Wichita Falls. He has one brother and one sister. Mr. Pedder has been married four times, most recently to Cheryl Pedder for less than a year. He has three daughters and a son from the prior marriages.

440 Louisiana Street, Suite 900, Houston, Texas 77002
713 460-3000  www.polygraphusa.com

EXHIBIT

6

Mr. Pedder is employed at Baker Transmission in Orange as a mechanic. He reported no prior arrests or convictions during his lifetime.

## EXAMINEE'S STATEMENT:

Mr. Pedder identified the alleged victim in his case as Alana, the thirteen year old daughter of his step-son, William Bishop, who lives in Deweyville, Texas.

Mr. Pedder stated Alana would sometimes come over on weekends "to clean the shop" and one day she announced that she had been having sex. In response to this, Mr. Pedder asked her, "What are you going to do when they find out?"

According to Mr. Pedder, Alana answered by telling him, "I'll tell them I've been using tampons. You know one of them. You're kin to them". When she made this comment, Mr. Pedder advised her he didn't know anyone in Deweyville and she said, "It's B.J." She subsequently mentioned her grandfather and a man she had babysat for.

Mr. Pedder stated he became confused and he asked her why she was telling him this information. She responded by telling him, "They all think you're messing with me".

Mr. Pedder recalled that she then asked for a dirt bike and when he told her no, she advised him, "All I have to do is show some tears and everyone believes me".

Mr. Pedder stated he became concerned over her allegations and he consulted with a neighbor who is a Port Arthur Police Officer who in turn notified the Orange Police.

Mr. Pedder stated denied ever having sexual intercourse with Alana or ever having any sexual contact with her.

## EXAM ADMINISTRATION:

The following relevant questions were formulated for Mr. Pedder's polygraph examination based on the case facts and the results of the pre-test interview. All questions were reviewed with him prior to the exam and his answers follow in parentheses:

4. Have you ever had sexual intercourse with Alana? (NO)

6. Have you ever engaged in any sexual acts with Alana? (NO)

2

## EXAMINER'S ANALYSIS:

This examination was administered utilizing the U.S. Air Force MGQT format. It is the opinion of this examiner that there were no significant physiological responses to the relevant questions in this series. This exam is evaluated as **NO DECEPTION INDICATED.**

John S. Swartz, Licensed
Texas Polygraph Examiner
Former Federal Examiner

3

# JOHN S. SWARTZ
## CRIMINAL POLYGRAPH EXAMINER
## RETIRED FEDERAL EXAMINER
## U.S. DEPARTMENT OF JUSTICE

- **POLYGRAPH CONSULTANT**
  **CHIEF'S COMMAND LEGAL STAFF**
  **HOUSTON POLICE DEPARTMENT**
  and
  **OFFICE OF THE INSPECTOR GENERAL**
  **CITY OF HOUSTON**

- **MEMBER**
  **SEX OFFENDER TESTING COMMITTEE**
  **AMERICAN POLYGRAPH ASSOCIATION**

- **POLYGRAPH CONSULTANT**
  **NBC NEWS/DATELINE**
  **NEW YORK CITY**

John S. Swartz is a former Federal examiner for the United States Government and has been licensed by the State of Texas for twenty nine years. He retired from the U.S. Department of Justice/Drug Enforcement Administration in August 2012.

Mr. Swartz is a graduate of the University of Texas at Arlington. While in college, he was employed by the Dallas Police Department and the Texas Department of Public Safety. In 1976, the U.S. Drug Enforcement Administration recruited him and he has served at posts throughout Texas and South America. He initially attended Sturm School of Polygraph and later the United States Department of Defense Polygraph Institute at Fort McClellan, Alabama. He subsequently became the U.S. Government's only polygraph examiner in South America.

In 1995, Mr. Swartz opened his private practice in Houston. During his twenty nine years as an examiner he has tested persons charged with a broad spectrum of Federal and state crimes.

In 1995, Mr. Swartz initiated the sex offender testing program for the Harris County District Courts for all sexual offenders on probation.

He now tests probationers and parolees for ten South Texas counties and the United States Probation Office.

In 2007, Mr. Swartz became the examiner and consultant to NBC News/Dateline in New York on the Diane Zamora "Texas Cadet Murder Case" and his report of Zamora's examination can be viewed on the NBC/Dateline website.

In 2008-2009, Mr. Swartz became one of ten examiners in the United States invited to be a member of the American Polygraph Association's Sex Offender Testing Committee, which just wrote and published the national guidelines for testing sex offenders.

In 2008 and continuing through 2011, Mr. Swartz became the polygraph consultant and advisor to the Houston Chief of Police and the Chief's Command Legal Staff as well as the Office of the Inspector General for the City of Houston. He retired from DEA in 2012 and now conducts examinations worldwide.

Additional agencies he has served include:

- Bexar County District Attorney's Office

- Brownsville Police Department, Chief Carlos Garcia, on Internal Affairs issues.

- Odessa Police Department on Internal Affairs issues.

- Montgomery County District Attorney's Office, Conroe, Texas on Internal Affairs/police issues.

- De Witt County Sheriff's Department on Internal Affairs issues.

He is a frequent consultant to the Harris County judges, often serves as an expert witness, and he has provided training on polygraph matters to judicial meetings, bar associations, and law enforcement conferences throughout the United States including the Texas Center for the Judiciary, Harris County District Court Judges, and the Harris County Criminal Defense Lawyers Association.

Mr. Swartz has also appeared on the Dr. Phil Show in Los Angeles, and has served as a polygraph consultant and interviewee with KTRK-Channel 13 in Houston; KHOU Channel 11-Houston, Channel 26-Fox News-Houston, and KTRH Radio.

H

EX PARTE DAVID CLIFFORD PEDDER, JR.

NO. A-100,640-AR

STATE OF TEXAS

COUNTY OF ORANGE

## AFFIDAVIT

My name is Bruce N. Smith and I am the attorney who represented Mr. David C. Pedder, Jr. in this cause, in which he was charged with aggravated sexual assault.

I was hired by Mr. Pedder in November of 2010. I spent a great deal of time consulting with and interviewing Mr. Pedder concerning the allegation that had been made against him, regarding having sex with a twelve (12) year old child. After thoroughly discussing the matter with Mr. Pedder, it became apparent that our strategy had to be that Mr. Pedder was simply not guilty of these allegations and that the owner of the business that Mr. Pedder worked at could testify that he could not have had sex with this child at his place of business as alleged by the child, due to the fact that Mr. Pedder did not have a key to the place of business and therefore could not have been alone with this child in the place of business, as alleged by this child. We felt that through the testimony of Mr. Pedder and especially his boss, that the jury would either not believe the child's statements or would at least have reasonable doubt that the allegations were true.

Soon after being hired by Mr. Pedder, I made contact with the assistant district attorney who was at that time in charge of the case, Mr. Cory Kneeland. Mr. Kneeland and I discussed the case thoroughly and the evidence against Mr. Pedder and Mr. Kneeland informed me that the State's offer would be thirty (30) years in TDCJ, which of course Mr. Pedder rejected.

To the best of my recollection, approximately in January of 2011, I reviewed the State's file at the offices of the Orange County District Attorney and I also received a copy of Mr. Pedder's recorded statement, as well as his written statement that he had given to the police. During the course of inspecting the DA's file I reviewed the reports from the various officers involved, as well as, the statement given to the police from the alleged victim. I also received copies of hand written letters written by Mr. Pedder. One of these letter was a hand written letter to the child as well as suicide letters signed by Mr. Pedder. I additionally reviewed the SANE report that had been prepared by the State's expert, Brenda Garrison. I later personally interviewed Ms. Garrison regarding her findings in the report that she filed.

Subsequent to receiving this evidence from the State, I met with Mr. Pedder on several occasion at my office and we decided that he would submit himself to a polygraph examination to be done by Mr. John Swartz, who is a former Federal Examiner for the United States Department of Justice. Mr. Swartz is a well-known criminal polygraph examiner located in Houston, Texas, and was well regarded by law enforcement. In February 2011, I contacted Mr. Swartz to make

Page 1 of 3

EXHIBIT

H

arrangements for my client to be examined by him and we arranged for the examination to occur on February 21, 2011. I spent a great deal of time preparing Mr. Pedder for this polygraph examination and even gave him some written material to study that would help prepare him for the polygraph examination. On February 21, 2011, Mr. Swartz conducted a polygraph examination of Mr. Pedder and I received a written report from Mr. Swartz showing that Mr. Pedder showed no deception when he denied having any kind of sex with the alleged victim. To the best of my recollection I hand delivered a copy of this polygraph report to the district attorney's office for their review. At that time I again discussed the purported evidence against Mr. Pedder with the prosecutor and again urged them to reconsider pursuing this case.

Though the course of these proceedings I had several meetings with the prosecutor, Mr. Phillip Smith, discussing the evidence of the case. But, he made it clear that they were going to pursue the case against Mr. Pedder and would not dismiss it.

I prepared serval pretrial motions on behalf of Mr. Pedder that were ready to be filed at any time. I prepared Defendant's Election as to Punishment, Community Service Motion, Motion for Notice and to Suppress, Motion to Determine Admissibility of Statement, Motion to Suppress Statement, Motion for Production of Writings and Statements, Motion for Voir Dire of Expert Witness, Motion for Witness List, Motion for Discovery, Motion for Discovery of Punishment Evidence, and Motion to Suppress Evidence.

In further preparation for trial, I interviewed and had several conferences with Mr. Pedder's employer, Mr. Don Freeman. I was so impressed with Mr. Freeman and his commanding appearance and knowledge of my client and the situation facing my client. Mr. Freeman in my option was so convincing in what he was able to testify to that we made the decision that it would not be necessary to take a chance and call other witnesses who would simply be repetitive and redundant and would not be as impressive to the jury as Mr. Freeman. On at least two occasions prior to trial I drove by Mr. Pedder's and Mr. Freeman's place of employment to see where this alleged sexual assault allegedly occurred.

I also interviewed prior to trial the witness, Holly Burnitt, and I spent hours preparing Mr. Pedder for his testimony that he would give at his trial. I additionally obtain copies of Facebook records of a Brandy Bishop, but these records provided no help in the defense of his case.

During the course of the trial it is my belief that through the cross examination of the alleged victim in this case as well as the direct testimony of Mr. Freeman and the Defendant, Mr. Pedder, that we showed, or at the very least, established reasonable doubt, that the sexual assault could not have occurred in the manner describe by the alleged victim. I was very shocked and disappointed that the jury did not agree with me.

I fought hard for Mr. Pedder throughout this entire proceedings, but apparently Mr. Pedder's suicide attempts both before trial and during trial weighed heavily on the minds of the jurors.

_____
Bruce N. Smith

State of Texas                                          §
County of Jefferson                                     §

SIGNED under oath before me on June 9, 2015.

_____
Notary Public, State of Texas

I

STATE OF TEXAS                                   §
                                                 §
COUNTY OF ORANGE                                 §

## AFFIDAVIT OF DONALD F. FREEMAN

BEFORE ME, the undersigned authority, personally appeared Donald F. Freeman, who, having been duly sworn, stated:

### I. Background Information and Relationship with David Pedder

My name is Donald F. Freeman. I reside at 6203 Rosewood, Orange, Texas 77632. I own Bakers Transmission at 404 W. Green, Orange, Texas. I was born in Purcell, Oklahoma. I graduated from Muskogee High School in Muskogee, Oklahoma. From there I went to Central State University in Edmond, Oklahoma and graduated with a BS degree major in history and double minor in psychology and PE. From there I coached for 2 years at Del City High School in Del City, Oklahoma. From there I moved to Putnam City where we won the state 5A championship in football. From there I went back home to Muskogee and I was the head football coach at Muskogee High School for three years. From there I became a service manager for a fork lift company.

I moved to Orange and bought Baker's Transmission in 1983 with a partner. I have been the owner for 32 years. During this time, I mentored kids though the high school work programs and through the Texas Workforce Commission program; so it is not unusual for me to have students working in my shop. We even had classes come to my shop from their tech schools to see how we operate. Many of the students and people that were trained and mentored at Baker's Transmission continued working in Southeast Texas in this type of business. For example, Ronnie Comeaux worked for us during school and is now a plant manager at Pineland Paper Mill. Another young man named Brian Williams now owns an auto repair and machine shop in Beaumont.

I met David Pedder while he was working at Procell Brothers down the street from my shop. He had worked there for 21 years and Mr. Procell was very satisfied with him as an employee. But, after Hurricane Ike, Procell Brothers did not open back up, so I offered Dave a job in January 2009. Dave was loyal, trustworthy, knew his craft, and was always at work. He was one of the best employees I ever had. He had unique skills to fix and repair any vehicle that was brought into the shop. Dave was well liked and respected by management and co-workers. Likewise, Dave respected his co-workers and management and owners of Baker's Transmission.

### II. Charges Against Dave and My Dealings with Bruce Smith

Sometime in late May of 2010, I learned initially of the accusations against Dave. I did not know any details and because Dave did not actually commit the offense, he didn't know any of them either. Dave told me directly that he never had sex with the complainant. In my twenty years of interacting with Dave, I have never known him to lie



EXHIBIT

tabbies

1

or be dishonest.

An investigator from Orange PD, named Keaton, came by my shop in June, 2010 and told me that a young lady was alleging that Dave had sex with her in the shop some morning in April when I was late to work on a Saturday. My wife and sons (who work at the Shop along with me) all met with Keaton in my office. He asked questions to us and we each talked to him and provided answers.

Generally, I recall that we informed Keaton that I was never late for work. We all told him, in no uncertain terms, that the allegation must be false because there was no Saturday in May or otherwise that it could have occurred. We also told him that the shop is never open unless one of the family is present. To my knowledge our statements were never turned over to Bruce Smith. Detective Keaton never looked at the "building room" nor did he ask our permission to take the mats from the "building room" in order to test them for DNA. If he had, I would have given them to him.

A number of lawyers Dave spoke with were way too expensive for him to afford. So, someone recommended he hire Bruce Smith who would only charge $2,500.

After I learned that Bruce Smith was representing Dave, I became concerned that Bruce had not been contacted me as a witness or a person with material information relating to the allegations. I also became aware that Dave had taken a polygraph test, that he had passed the test, and Dave and I both believed that Bruce Smith was going to use the polygraph results to negotiate a dismissal of the case. *See* Exhibit G. Dave expressed a willingness to take a polygraph at the governments request as well. They never provided him that opportunity.

I have reviewed Bruce Smith's affidavit in the present case where he indicates that he "interviewed and had several conferences" with me. *See* Exhibit H. This is simply untrue. The fact is, after the meeting with Keaton, I did not hear much more about the case until nearly two years later. All of a sudden it came to my attention that the case was being called for trial. It was at this time that I began calling Bruce Smith because I was concerned for Dave that I had never been contacted as a witness or interviewed by Bruce. I called Bruce Smith's office at least five times to offer my assistance and he did not take my call nor did he return my call until the Friday before trial.

On that day, I called Bruce Smith again and he finally took my call. I explained to him that there was no way the allegations, as I understood them, could have happened because Dave did not have a key nor did he have the alarm code that would allow him access to Baker Transmission without myself or one of my family members being present. As of the day the trial started, Bruce Smith never asked me any substantive questions, my family members who work at the shop, nor did he come to my place of business to view or photograph the alleged scene. Further, I was not listed as a witness on behalf of Dave, was not subpoenaed, and was not asked to be a defense witness. In fact, I was subpoenaed as a witness for the State. Sometime during the first day of trial, the prosecutor Phillip Smith told me that he would not need me the next day as he had

2

gotten what he needed from other witnesses. Since Bruce Smith had never discussed my testimony with me, I almost walked into the Courtroom to watch the proceedings but decided not to. I learned later that, had I done so, it would have completely disqualified me as a witness.

After the first day of trial, Bruce Smith told Dave that his ex-wife's testimony had hurt them and that Dave was going to go to prison. Prior to calling me as a witness, Bruce never discussed with me the nature or details of the allegations made by the complainant, he never prepared me for my testimony, and he never asked me about other witnesses who could support the notion that Dave did not have access to the building unless a family member or I was present.

Once the trial started, I was still unable to learn nor was I advised about the facts and testimony that was being developed in the trial. It wasn't until later, when I read the transcript of the trial that I realized that the allegations were both impossible and illogical. I was able to conclude that had Bruce interviewed me and my family, visited the scene, or prepared me for testifying, the outcome would have been very different. Afterwards, I was very frustrated that I was so unprepared for my testimony by Bruce.

### III. As a Practical Matter the Allegations against Dave are Impossible

Dave absolutely did not have a key to enter the Baker Transmission Building at any time prior to June 2010. The Baker Transmission Building requires a key on either side of the main door. *See* Exhibit A-1, A-2, and A-3. There is an alarm system that Dave would have had to disarm and he did not have the alarm code prior to the allegations being made and he did not have any way to learn or ascertain the alarm code. *See* Exhibit A-4 and A-5. The shop area of Baker's Transmission has large bay doors that are 12' x 20' and they are locked with a chain and a padlock. *See* Exhibit C-1, C-2 and C-3. Given the part of town where my shop is located, we are vigilant in protecting our property, so doors are always locked and the alarm is always on when no family member is present.

In approximately 1998 I bought my partner out and became the sole owner of Baker's Transmission. From that date until the date of allegations made against Dave, I had never given a key to any employee. Only my immediate family has a key to the business, with the sole exception that a trusted peace officer is given a key when the entire family has been out of town on three or four occasions. This sole exception situation did not apply to the time frame in question in this case.

I have never arrived at work in the morning at Baker's Transmission and found or discovered that David was already inside the building. During the time frame in question, every Saturday morning, a group of local men met at Baker's Transmission for coffee and socializing. If I was ever a little late to work on a given Saturday, David and the other men would have been forced to wait outside until I arrived. Those men could have been contacted by Bruce Smith and called to testify to that fact, but they were not. Regardless, I do not recall being late on any occasion during April, May, or June of 2010.

3

## IV. The Nature of the Allegations are Illogical

When I reviewed the trial transcript, I learned for the first time that the young lady testified that: 1) the alleged incident happened on a Saturday in May (not April as Det. Keaton had told us), 2) that the doors to Baker's Transmission were left open, 3) that no one was there, 4) and that the alleged sex act occurred on the floor of what we call the "building room." *See* Exhibit B-1, B-2, and B-3. I became aware that there was a discussion about carpet in the "building room" but there is no carpet in the "building room" (nor any other room in the building for that matter). The "building room" does have long, narrow floor mats. *See* Exhibit B3. However, those would be an uncomfortable, illogical, and unclean place to have impromptu sex. I would also add that there are glass doors to the "building room," glass windows in the "building room," and the bay door windows are glass; all are untinted. *See* Exhibit C-1 and C-2. As such, someone outside the building or in the shop could readily view activities in the "building room."

If one were going to commit an offense like this, the only logical place to do so would be in the main office. The main office has a couch. It also has windows that enable you to see out but the tint prevents someone outside from seeing in. *See* Exhibit D-1, D-2, and D-3. The only other place of privacy in the building would have been a lockable bathroom. *See* Exhibit E-1, E-2 and E-3.

In his affidavit Bruce Smith indicated that he "drove by" my shop on "at least two occasions." Yet, Bruce Smith never came to my shop prior to trial. He never photographed the scene of the alleged offence. Despite it being factually impossible, because Dave did not have a key, if Bruce had come to the shop, photographed the scene, and entered the pictures into evidence, he would have been able to demonstrate visually how illogical and nonsensical the complainant's story was.

## V. Dave only Obtained a Key after the Allegations came to Light.

Subsequent to the allegation, the complainant's family members began to harass Dave, my family, and me. For example, they called and harassed my wife, presented themselves at my shop, verbally attacked her and made threats against Baker's Transmission and Dave. As a result of their actions, we called the police and informed them of the threats. A report was filled out, but nothing was done. *See* Exhibit F1.

This was the first time we had experienced a situation like this. It was so unusual that we had a family meeting and decided that we would give Dave a key to allow him to have a safe place to stay and sleep at night because they were also attacking him at home. This provided him some security in the building and also there was an alarm system to further protect him from the threatening conduct of the complainant's family members. If I had believed the complainant's story, I would not have given him a key after the allegations arose.

On the stand, I tried to answer the questions I was asked rather than the questions

4

that I wanted someone to ask me. As a result, when Bruce Smith asked me: "Did Mr. Pedder obtain – did you give him keys to your business?" I truthfully answered "yes." However, if he had asked me whether Dave had keys to the business on May 15, 2010 or prior to that, the answer would have been "no." That question and answer would have been more helpful to the jury in making their decision, but that was not the question I was asked.

### VI. Bruce Smith Did Not Obtain Mitigating Evidence from Me

After Dave was convicted, Bruce Smith asked us to testify at punishment. He did not indicate what the nature of that proceeding would be or what kind of testimony he wanted us to provide. As it turned out, Smith simply wanted us to rehash guilt/innocence issues rather than provide testimony about why Dave should get a low sentence.

Now that I know how proceedings like this should go, if asked, I would have provided the following testimony about Dave: First, Dave's mother's boyfriend shot and killed his dad when he was young and he was forced to move in with his grandfather. His grandfather was a grave digger for an area cemetery and that experience had a very negative impact on Dave and his ability to effectively communicate with others. As a result, he had to quit High school at 16 to support himself and went to work as a mechanic. Dave has worked consistently at one or multiple jobs up until his incarceration. Other challenges that he has faced in his life include having a wife who committed suicide.

None of this was asked about by Bruce Smith on or off the record. In an effort to mitigate Dave's punishment. Moreover though Bruce did not ask me about Dave as a person. What I know is that, despite those challenges in his upbringing, he is a man with great work ethic who is loyal, trustworthy and punctual. While working for me, he never missed a day of work. He was consistent and reliable. As a person, he is quiet, low key, and passive. For example, when a complainant's family member verbally attacked him at our shop, instead of fighting back, he went to the back of the shop to avoid the confrontation.

I believe had Bruce Smith learned about Dave's history and provided testimony about it to the court it would have impacted the outcome of his sentence. Because I am not a lawyer, I did not understand the process and did not know to volunteer the information to Mr. Smith when he failed to ask me about it.

### ###

"My name is Donald F. Freeman. I have reviewed my affidavit above and the facts stated therein are true and correct."

_Donald F. Freeman_
Donald F. Freeman

Sworn to and subscribed before me on _June 11_, 2015.

_Deana Aylor_
NOTARY PUBLIC

DEANA AYLOR
MY COMMISSION EXPIRES
August 26, 2015

6

Affidavit of Beverly Freeman

The State of Texas

County of Orange

BEFORE ME, the undersigned authority on this day personally appeared Beverly Freeman, of Orange, Orange County, Texas, hereinafter called "Affiant", who after by me being first duly sworn did depose and say as follows:

"My husband and I own Baker's Transmissions. I have worked in the shop since 1999. We hired Dave to work at Baker's right after Hurricane Ike. I loved Dave. He was my favorite of all of our employees we have had. He is quiet, soft-spoken, and got along really well with all of us. He was pleasant to have at work. My grand-kids loved Dave. They are between the ages of 7-18 and he was always polite and respectful with them.

Our shop is a small family owned business. All of us have keys. There is no need for the employees to have keys. In thirty years no one has regularly had a key. In fact, my brother, Larry Haywood, lived with us and worked for our shop for four years but we never gave him a key or the alarm code because one of us was always there and there was no need for it.

I became aware of the allegations against Dave in May or June of 2010 when the girl's family began harassing and accosting us. Dave's wife called and said: "Y'all are employing a child molester and he is going down and Baker's Transmission is going with him." We also learned that they were attacking Dave at his home. They had broken into his house and stolen all belongings. On June 2nd, 2010, Don, the boys, and I had a family meeting and made the decision to give Dave access to the shop overnight so he could get away from the torment from the girl's family. It was the first time we had done anything like that.

Detective Keaton from the Orange Police Department talked to us regarding the allegations a week to ten days after the allegations came to light. He met with all four of us in our office (see Exhibit C). He told us that A.A. was accusing Dave of having sex with her in the shop on a Saturday in April. According to Keaton, she had said that Dave was able to open the door because Don was fifteen minutes late or so. We laughed at the notion of him being late. I told him that Don is a routine guy, as a former football coach, and he isn't late. Plus, we do not ever leave our doors unlocked and no one else can open them. I told him – and another of other people – that it's crazy that we would give out keys to employees. We are a family run shop and do not need to do that.

Even though the girl testified that the events were committed at our shop, I was never contacted by Dave's lawyer about testifying. Our other employees and several regulars that came into the shop on Saturdays also know that the girl's story is impossible. The jury should have heard from each and every one of us. Saturdays are one of our busiest days and people are always there first thing Saturday morning. Given all the glass windows into our shop, the girl's story simply makes no sense.

EXHIBIT

tabbies

J

Dave was a valuable, considerate, hard working employee. Some people are always looking for a way to get out of work and Dave was always looking for ways to help. The notion that he would take advantage of our trust by committing this crime at our store does not align with the person we have known for so long.

Bruce Smith never came by our shop before the trial started and I never met him until after the trial started. We were also never contacted by his lawyer prior to sentencing - a month later - in an effort to reduce his punishment. I could have provided valuable information to the Court about Dave's background, the things he has had to overcome, and that he is a really good person that we care for very much. Even if the Court believed Dave had committed this offense – which he did not - we would have had people lined up around the block to testify as to what a good person he is."

EXECUTED this the /1th day of June, 2015.

_Beverly Freeman_
Affiant

SUBSCRIBED AND SWORN to before me by the said Beverly Freeman, on this the /1th day of June, 2015.

_Deana Aylor_
Notary Public in and for the
State of Texas

DEANA AYLOR
MY COMMISSION EXPIRES
August 26, 2015

K

The State of Texas

County of Orange

## Affidavit of Greg Freeman

BEFORE ME, the undersigned authority on this day personally appeared Greg Freeman, of Orange, Orange County, Texas, hereinafter called "Affiant", who after by me being first duly sworn did depose and say as follows:

"My family owns Baker's Transmissions. My mother, father, and brother all work at the business with me. Prior to June 2010, no one outside the family had access to a key to the building. No one outside the family had the alarm code to the building either.

The work station, depicted in Exhibits B-1, B-2, and B-3 is my work station in the "building room." In April, May, and June of 2010, I never observed or noticed anything on or around my work station that would indicate that people had had sex on the floor or elsewhere at my work station.

The Complainant, A.A., began working for several hours on Saturdays helping clean up, empty trash, and doing odd jobs in February of 2010. On several occasions I came to the shop on Saturday to work on my race car and Dave and A.A. were in Dave's truck waiting for someone to open up. They had to wait because Dave did not have a key to get in the building. Dave was always early to work, not only on Saturdays, but everyday.

After the allegations by A.A. surfaced, I learned that Dave was being harassed and attacked by A.A.'s family. At that time, we held a family meeting to discuss giving Dave a key and the alarm code so he could stay at the shop and would be less likely to be harmed by the family. Prior to that, Dave would never have had access to the building unless one of us family members was present.

I do not recall my father, Don Freeman, every being late for work – by more than a couple of minutes - whether on Saturday or during the week. Further, we have never left the doors to our building unlocked overnight as we have hundreds of thousands of dollars worth of equipment, tools, and vehicles in our facility.

I was never contacted by Dave's lawyer before the trial to testify. The jury should have heard from me. I think it would have made a difference."

EXECUTED this the 4th day of June, 2015.

_Affiant_

SUBSCRIBED AND SWORN to before me by the said Greg Freeman, on this the 4th day of June, 2015.

_Deana Aylor_
Notary Public in and for the State of Texas

DEANA AYLOR
MY COMMISSION EXPIRES
August 26, 2015

L

The State of Texas

County of Orange

### Affidavit of Jeff Freeman

BEFORE ME, the undersigned authority on this day personally appeared Jeff Freeman, of Orange, Orange County, Texas, hereinafter called "Affiant", who after by me being first duly sworn did depose and say as follows:

"My family owns Baker's Transmissions. My mother, father, and brother all work at the business with me. Prior to June 2010, no non-family member had access to a key to the building. No person outside the family had the alarm code to the building either. On occasion, in the past, we have given a key to Randy Baker, who is a peace officer here in Orange, to look after the shop when we have all gone out of town on family trips.

After the allegations surfaced, I learned that Dave was being harassed and attacked by A.A.'s family. Afterwards, we had a family meeting to discuss giving Dave a key and the alarm code so he could stay at the shop for his safety. Prior to that, Dave would never have had access to the building unless one of the family members was present.

I recall meeting with a Detective named Keaton from the Orange Police Department regarding the allegations. He told us that A.A. was accusing Dave of having sex with her in the shop on a Saturday. According to Keaton, she had said that Dave opened the door because Dad was fifteen minutes late or so. I informed Keaton that I do not recall my father, Don Freeman, ever being late for work. We have never left the doors to our building unlocked overnight as we have equipment, tools, and vehicles in our facility.

Dave and I spoke on a number of occasions about my reservations about Bruce Smith. Dave told me that Bruce would not return his calls. Dad told me that he was trying to contact Bruce and he could not get his calls returned either. Once the trial began, Dave showed me a note from Bruce demanding $10,000 in order to go to trial. Bruce told Dave that the case would never go to trial and so he was very surprised when Bruce told him he would need extra money to go to trial after the trial began.

It was my opinion that Dave should have gotten another lawyer. Bruce Smith never came by our shop before the trial started and I never met him until after the trial started. I was never contacted by Dave's lawyer before the trial to provide a statement or testify. The jury should have heard from me. I think it would have made a difference."

EXECUTED this the _11_ day of _June_, 2015.

_____
Affiant

**EXHIBIT**

L

SUBSCRIBED AND SWORN to before me by the said Jeff Freeman, on this the _11th_ day of _June_, 2015.

_____
Notary Public in and for the State of Texas

DEANA AYLOR
MY COMMISSION EXPIRES
August 26, 2015

# BAKER'S TRANSMISSIONS



GLASS DOORS & WINDOWS

PENGAD-Bayonne, N.J.

**EXHIBIT**

M

Affidavit

The State of Texas

County of Orange

BEFORE ME, the undersigned authority on this day personally appeared Gerald Thomas, of Orange, Orange County, Texas, hereinafter called "Affiant", who after by me being first duly sworn did depose and say as follows:

"My name is Gerald Thomas and I have been friends with Don Freeman for over 20 years. It is a habit of mine to go by Baker's Transmissions on Saturday mornings. To my knowledge, no one had a key to the building other than family members. I specifically recall a Saturday morning in the Spring of 2012 that I went to Baker's Transmissions and observed David Pedder and the young girl sitting in David's truck. I stopped and greeted them. Don Freeman was not present nor was any member of his family and the business was locked and closed. Dave did not have a way into the building. I went to Procell's before coming back to Baker's. When I returned, Don had arrived and the shop was open. Now knowing the nature of the allegations, I believe them to be impossible and I believe my testimony would have made a difference in Dave's case.

I was never contacted by Bruce Smith. Had I been contacted I would have testified to these facts."

EXECUTED this the _11th_ day of _June_, 2015.


Affiant

SUBSCRIBED AND SWORN to before me by the said Gerald Thomas, on this the _11th_ day of _June_, 2015.

DEANA AYLOR
MY COMMISSION EXPIRES
August 26, 2015

Notary Public in and for the
State of Texas



EXHIBIT

N

Affidavit of Randy Becker

The State of Texas

County of Orange

BEFORE ME, the undersigned authority on this day personally appeared Randy Becker, of Orange, Orange County, Texas, hereinafter called "Affiant", who after by me being first duly sworn did depose and say as follows:

"My name is Randy Becker. On Saturdays we get together at Baker's Transmissions to drink coffee and talk drag racing. I have been at Baker's before Don Freeman arrived on a number of occasions. On many occasions Dave and I would sit outside the business because we had no way to get in. This has been our practice for the past thirty years. I think if I was contacted to be a witness at Dave's trial, it would have made a difference in the jury's eyes."

EXECUTED this the _11th_ day of _June_, 2015.

_Randy Becker_
Affiant

SUBSCRIBED AND SWORN to before me by the said Randy Becker, on this the _11th_ day of _June_, 2015.

_Deana Aylor_
Notary Public in and for the
State of Texas


DEANA AYLOR
MY COMMISSION EXPIRES
August 26, 2015

EXHIBIT

O

ρ

## Affidavit of Larry Haywood

The State of Texas

County of Orange

BEFORE ME, the undersigned authority on this day personally appeared Larry B. Haywood, of Brookshire, Waller County, Texas, hereinafter called "Affiant", who after by me being first duly sworn did depose and say as follows:

"My name is Larry B. Haywood. I worked for my brother-in-law for four years. In that time I was never given a key to the shop. One of the family, Don, Beverly, Greg, or Jeff was always there. There was no need for anyone else to have a key to the building. I was not contacted by Dave's lawyer."

EXECUTED this the 12th day of June, 2015.



Affiant

SUBSCRIBED AND SWORN to before me by the said Larry B. Haywood, on this the 12th day of June, 2015.

Deana Aylor

Notary Public in and for the
State of Texas

DEANA AYLOR
MY COMMISSION EXPIRES
August 26, 2015



EXHIBIT

P

Q

# AFFIDAVIT

THE STATE OF TEXAS

COUNTY OF _ORANGE_

BEFORE ME, the undersigned authority on this day appeared _LEONARD HUTTON_

_ORANGE_ , _ORANGE_ County, Texas, hereinafter called "Affiant", who after by me

being first duly sworn did depose and say as follows:

MY NAME IS LEONARD HUTTON AND I AM THE GRANDFATHER OF DAVID PEDDER, JR. AND I RAISED DAVID AS MY SON. ON SEVERAL OCCASSIONS I WOULD COME BY BAKER'S TRANSMISSIONS ON SATURDAY MORNINGS AND DAVE WOULD BE WAITING ON DON FREEMAN, THE OWNER TO ARRIVE. HE COULD NOT GO INTO THE BUILDING BECAUSE HE DID NOT HAVE A KEY TO THE SHOP. I WAS NOT CONTACTED BY DAVE'S LAWYER TO TESTIFY TO THIS FACT. I FEEL THIS WOULD HAVE MADE A DIFFERENCE IN DAVE'S CASE.

EXECUTED this the ___5TH___ day of ~~January~~ SEPT, 2014.



EXHIBIT
Q

_Leonard Hutton_ _____name

**printed** LEONARD HUTTON

    SUBSCRIBED AND SWORN to before me by the said _LEONARD HUTTON_, this the 5TH

Day of _SEPT_ 2014.

_Beverly Freeman_

**Notary Public, State of Texas**

BEVERLY FREEMAN
Notary Public, State of Texas
My Commission Expires
March 14, 2018

Affidavit of Kirby Procell

The State of Texas

County of Orange

BEFORE ME, the undersigned authority on this day personally appeared, Kirby Procell, of Orange, Orange County, Texas, hereinafter called "Affiant", who after by me being first duly sworn did depose and say as follows:

"I worked with David Pedder for twelve (12) years. This crime he was convicted of is not in his character. This is not the man I knew. He was reliable, productive, and honest.

Bruce Smith never called me about testifying at the punishment phase of the trial."

EXECUTED this the _11th_ day of _June_, 2015.

_Kirby Procell_
Affiant

SUBSCRIBED AND SWORN to before me by the said Kirby Procell, on this the _11th_ day of _June_, 2015.

DEANA AYLOR
MY COMMISSION EXPIRES
August 26, 2015

_Deana Aylor_
Notary Public in and for the State of Texas

EXHIBIT
R

S

Affidavit of Quincy Procell

The State of Texas

County of Orange

BEFORE ME, the undersigned authority on this day personally appeared Quincy Procell, of Orange, Orange County, Texas, hereinafter called "Affiant", who after by me being first duly sworn did depose and say as follows:

"My name is Quincy Procell. I was David C. Pedder's employer for eighteen years. After I closed my shop, Dave began working for Don Freeman at Baker's Transmissions. I have known Don Freeman for many years and I gave Don my highest recommendation that he hire David Pedder. I also told Don that David was probably the best and most qualified mechanic that ever worked for me.

On numerous occasions I stopped to talk with Dave while he was waiting on Don in the parking lot of Baker's. In the Spring of 2012, I visited with David Pedder early one morning in the parking lot at Baker's Transmissions. I recall he and a young female were sitting in his truck and they were waiting for Don Freeman to open the building. He could not get into the building until Don arrived because he did not have a key to the building. I was not contacted by Dave's lawyer to testify to that fact. I am sure that my testimony would have made a difference."

EXECUTED this the 11th day of June, 2015.


Affiant

SUBSCRIBED AND SWORN to before me by the said Quincy Procell, on this the 11th day of June, 2015.

DEANA AYLOR
MY COMMISSION EXPIRES
August 26, 2015

Deana Aylor

Notary Public in and for the
State of Texas

EXHIBIT
5



## Affidavit of Daniel J. Weaver

The State of Texas

County of Orange

BEFORE ME, the undersigned authority on this day personally appeared, Daniel J. Weaver, of Orange, Orange County, Texas, hereinafter called "Affiant", who after by me being first duly sworn did depose and say as follows:

"I have known Don Freeman and his business at Baker's Transmission for twelve (12) years. I have been to his business on several occasions throughout the years and I had never observed the business to be open without one or more of the Freeman family members present.

The company I am employed by uses Baker's Transmissions as our main source for transmission repairs. I personally have been at Baker's Transmissions the morning after receiving a call from Don Freeman that a vehicle was ready for pick up. I am generally always early to an appointment, and on a couple of occasions, I was earlier than the stores normal opening hour and Don was always the person who had to unlock the door and I would wait to enter the building until after Don had deactivated the building's alarm.

Don and I would finish our business and usually we would talk for a few minutes, drink some coffee and continue with our work days."

EXECUTED this the _11th_ day of ___June___, 2015.

_____
Affiant

SUBSCRIBED AND SWORN to before me by the said Daniel J. Weaver, on this the _11th_ day of ___June___, 2015.

_____
Notary Public in and for the State of Texas

DEANA AYLOR
MY COMMISSION EXPIRES
August 26, 2015

**EXHIBIT**

T

U

**AFFIDAVIT**

THE STATE OF TEXAS

COUNTY OF _ORANGE_

BEFORE ME, the undersigned authority on this day appeared _Latisa Pedder_

_ORANGE_ , _ORANGE_ County, Texas, hereinafter called "Affiant", who after by me

being first duly sworn did depose and say as follows:

My name is Latisa Pedder, I am the daughter of David Pedder. I drove my dad to and from work every day. He didn't have the keys to the shop, we had to wait on his boss to arrive to open the doors of the shop. I was always at my dad's job at Baker's. I went to all of his meetings with the lawyer Bruce Smith, even told him I would testify and the lawyer never called or ask for me to testify. If his lawyer would have called any of us to testify it would have made a difference.

EXECUTED this the _5TH_ day of ~~January~~ SEPT, 2014.

EXHIBIT

tabbies

U

printed <u>*Latisa Pedder*</u> name

Latisa Pedder

SUBSCRIBED AND SWORN to before me by the said <u>Latisa Pedder</u>, this the 6TH

Day of SEPT 2014.

Notary Public, State of Texas



BEVERLY FREEMAN
Notary Public, State of Texas
My Commission Expires
March 14, 2018

Affidavit of Kenny Pigg

The State of Texas

County of Orange

BEFORE ME, the undersigned authority on this day personally appeared Kenny Pigg, of Orange, Orange County, Texas, hereinafter called "Affiant", who after by me being first duly sworn did depose and say as follows:

"My name is Kenny Pigg. I have been by Baker's Transmissions on many occasions. I have been by when they were closed and when they were opened. In all of the years that I have been doing business and been friends with this group, I have never been by there when the shop was opened without one of the family members being present."

EXECUTED this the 11th day of June, 2015.

_____
Affiant

SUBSCRIBED AND SWORN to before me by the said Quincy Procell, on this the 11th day of June, 2015.

_____
Notary Public in and for the
State of Texas

DEANA AYLOR
MY COMMISSION EXPIRES
August 26, 2015

EXHIBIT

√

W

Affidavit of Keith Merritt

The State of Texas

County of Orange

BEFORE ME, the undersigned authority on this day personally appeared Keith Merritt, of Orange, Orange County, Texas, hereinafter called "Affiant", who after by me being first duly sworn did depose and say as follows:

"My name is Keith Merritt and I am the Sheriff of Orange County, Texas. I have driven by Baker's Transmissions on hundreds of occasions. I have known Don Freeman for 30 years. When the shop is open, the Freemans are always there to the best of my knowledge. I do not recall ever seeing the shop opened without one of the Freeman family members being present. I have never been by the shop and seen it open and only Dave there."

EXECUTED this the 15th day of June, 2015.

_____
Affiant

SUBSCRIBED AND SWORN to before me by the said Keith Merritt, on this the 15th day of June, 2015.

DEANA AYLOR
MY COMMISSION EXPIRES
August 26, 2015

_____
Notary Public in and for the
State of Texas


EXHIBIT

W

X

# Child Abuse & Forensic Services
## SANE Program

## SEXUAL ASSAULT EXAMINATION & FORENSIC REPORT FORM

Date: 6/4/10 Time of Exam: 1:30pm Location: CAFS SANE: B. Garison Chart#: 10-071

## GENERAL INFORMATION (Print or Type):

Patient Name: Alanna Apodaca Sex: F Race: W DOB: 7-3-97 Age: 12 SS#: 637603999

Address: 3198 Brent Drive City: Orange State: TX Zip: 77632

Home Phone: 409-882-4442 Work Phone: 8824569

May we contact you at: Don't contact ___ ✓Home ✓Work _____ Other: (Phone:_____)

Usual Health Provider: William Dunn Allergies: NKDA PCN

Current Medications: None

Did a representative from the investigating agency accompany you to *Child Abuse & Forensic Services*? (✓)Yes ( )No

If yes: Representative Name: Detective Keaton Agency Name: Orange PD

List everyone accompanying patient to *Child Abuse & Forensic Services*?
Name: Tina Johnson Relationship: Mom
Name: Bailegh Chaloupka Relationship: Aunt
Name: _____ Relationship: _____
Name: _____ Relationship: _____

Who does patient live with? ( )Self ( )Mother ( )Father ( )Both (✓)Other: Aunt Relationship: Bailegh chaloucrk

Is patient covered by insurance? (✓)Yes ( ) No
NOTE: Examination is paid by referring agency. Insurance will be filed by Quest Diagnostic lab work is indicated.
If yes, Name of Insurance: Medicaid Phone#:_____ ID#:_____

If the patient is a minor please complete:
Mother's Name: Bailegh chaloupka "Aunt" DOB: 6-14-1989 SS#: 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
Address: 3198 Brent Drive City: Orange State: TX Zip: 77632
Home Phone: 4098824442 Work Phone: 883-1119
May we contact you at: ✓Home ___Work ___Other: (Phone:_____)
Father's Name: Frank Holden "Uncle" DOB: 9-26-84 SS#: 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
Address: 3198 Brent Drive City: Orange State: TX Zip: 77632
Home Phone: 409-882-4364 Work Phone: _____
May we contact you at: ✓Home ___Work ___Other: (Phone:_____)

*Child Abuse & Forensic Services, 810 Hospital Drive, Suite 190, Beaumont, TX 77701*
*409-832-0421 (office) 409-839-8980 (fax) 409-895-7550 (after hours)*

1 of 5

**EXHIBIT**
X

**AUTHORIZATION:**

1. I hereby authorize the Sexual Assault Nurse Examiner (SANE) representative at *Child Abuse & Forensic Services* to perform a medical forensic examination for evidence of physical and/or sexual abuse and request medical treatment if indicated. I understand this may include the following:
   - Medical forensic examination of the genital area, which may include pelvic (internal) examination on post-pubertal females.
   - Collection of blood, urine, tissues and related specimens as needed.
   - Photographs which may include the anogenital area for the purpose of documentation.

I understand that the examination I am about to receive is performed by a forensic nurse examiner. The forensic nurse examiner will refer me to the emergency department of my choice for medical treatment by a physician if indicated.

I further understand and authorize all medical reports, including laboratory reports, photographs and forensic results to be released to Child Protective Services, and/or the police department and the District Attorney having jurisdiction, or as otherwise allowed by law.

Patient/Parent/Guardian Signature: *Athena Johnston* Date: 6-3-10

Witness Signature: *Uroula Henderson* Date: 6-3-10

---

*For Office Use Only*

Law Enforcement:     Case #: 1013174   Investigator: Det. Keaton
     Are they the Referring Agency?   (X)yes   ( )no

     Agency: Orange PD   County: Orange   Phone: 883-1845   Fax: 988-7434

CPS:          Case #:_____   Case Worker:_____
     Are they the Referring Agency?   ( )yes   ( )no

     Agency:_____   Phone:_____   Fax:_____

*Child Abuse & Forensic Services, 810 Hospital Drive, Suite 190, Beaumont, TX 77701*
*409-832-0421 (office)  409-839-8980 (fax)  409-895-7550 (after hours)*

2 of 5

Patient Name: _Alahna Apodaca_ DOB: _7-3-47_

## III. MEDICAL HISTORY:
1. Last normal menstrual period: _____ (✓)NA
2. Genital/Anal Surgical procedures: _denies_
3. Hospitalizations: _denies_

## IV. HISTORY OF ASSAULT/ABUSE: Source of history (✓) Child   ( ) Parent   ( ) Other _____
1. Document history given by patient. Identify source when including additional information.

_Child stated "He (David) had sex with me about a month ago. We were at his work, at Baker's Transmission."_

2. Did abuse cause:      Bleeding?       (·)YES ( )NO (✓)UNK
                    Pain?         (✓)YES ( )NO ( )UNK
3. History of ejaculate (Circle one) _on the carpet_   (✓)YES ( )NO ( )UNK ( ) Probable/Possible Site(s):____
4. Condom used? (Circle one)            ( )YES (✓)NO ( )UNK
5. Lubricant used?                  ( )YES (✓)NO ( )UNK
6. Suspects Name/s: _"David"_
7. Suspects relationship to victim:
    ( ) Stranger   ( ) Relative   specify:_____ (✓) Acquaintance   ( ) Other_____
8. Estimated time since last incident: _About 1 mo. ago_
9. How many times? (✓) One   ( ) More than one   Patient Comment:_____

## V. GENERAL APPEARANCE
Document any areas of trauma on body

Patient Name: _Alahna Aporduca_ DOB: _7-3-97_

## VI.  PHYSICAL EXAM          Patient accompanied by: ___o___          Relationship: _____

1. Child was:  (✓) fully  ( ) partially  ( ) not cooperative
2. Vital signs:
   Pulse: _88_ /min     Temperature: _98°_          Respirations: _18_ /min   Blood Pressure: _116/63_
3. Height: _5'4"_          Weight: _140_
5. HEENT          (✓) Normal  ( ) Abnormal          Comments: _____
6. Lungs          (✓) Normal  ( ) Abnormal          Comments: _____
7. Cardiovascular  (✓) Normal  ( ) Abnormal          Comments: _____
8. Abdomen         (✓) Normal  ( ) Abnormal          Comments: _____
9. Neurologic      (✓) Normal  ( ) Abnormal          Comments: _____
10. Tanner Staging:   Breast: ( )1 ( )2 (✓)3 ( )4 ( )5 ( )N/A   Genitals: ( )1 ( )2 (✓)3 ( )4 ( )5 ( )N/A

## VII.  GENITAL EXAMINATION

Exam positions used:  (✓) Supine  ( ) Knee-Chest  ( ) Lateral  ( ) Other _____
Speculum used?        ( ) Yes   (✓) No
Colposcope used?      ( ) Yes   (✓) No
Foley used?           (✓) Yes   ( ) No
SDFI                  (✓) Yes   ( ) No

Document any signs of acute and nonacute trauma such as:
   Bruising, Bitemarks, Sphincter tone, Lacerations, Petechial hemorrhages, Partial or Complete clefts, Attenuation, Scars, etc.

Document any other abnormalities which may or may not be related to sexual abuse such as:
   Erythema, Labial Adhesions, Neovascularization, Rash, Discharge, Smooth Areas on Anus, Skin Tags, etc

FEMALE:
Vulva:     No trauma noted
Vestibule: No trauma noted
Vagina:    N/A
Cervix:    N/A
Hymen:     Healed tear at 7 o'clock position
Rectum:    N/A
Anus:      No trauma noted

MALE:
Penis:     N/A
Scrotum:
Meatus:
Testicles:
Perinum:
Rectum:
Anus:      N/A

*Child Abuse & Forensic Services, 810 Hospital Drive, Suite 190, Beaumont, TX 77701*
*409-832-0421 (office)  409-839-8980 (fax)  409-895-7550 (after hours)*

Patient Name: *Alahna Apodaca* DOB: *7-3-9*

## VII. EXAMINATION IMPRESSION:

*Healed tear at 7 o'clock position to hymen — consistent with penetration of the female sexual organs.*

## VIII. TREATMENT PLAN
(✓) Follow up with own MD as needed
( ) Return to office on _____
(✓) Counseling as needed
( ) STD Prophylaxis – Cipro 500mg
                          Zithromax 1g
   ( ) Samples of medication given
   ( ) Prescription called to pharmacy:_____     Phone:_____
( ) Pregnancy Prophylaxis – Lo-Ovral given
( ) Other_____

## IX. LAB TEST

*Pregnancy — Neg*

Examiner's Name: *B. Garrison RN CA-CP SANE*

Examiner's Signature: *B. Garrison RN CA-CP SANE 6-11-10*

Co-Examiner's Name: _____

Co-Examiner's Signature: _____

*Child Abuse & Forensic Services, 810 Hospital Drive, Suite 190, Beaumont, TX 77701*
*409-832-0421 (office)  409-839-8980 (fax)  409-895-7550 (after hours)*

Page 5 of 5

Incident Report

# Incident Report #1013174

**ORANGE POLICE DEPARTMENT**
201 N 8th St.
Orange, TX 77630

# SEXUAL ASSAULT



## Event Info

| Date Reported | Time Reported | Time Dispatched | Time Arrived | Time Completed |
|---|---|---|---|---|
| 05/30/2010 | 19:39 | 19:40 | 00:00 | 20:37 |

| Addr. Of Occ. | City | District | Grid | How Reported |
|---|---|---|---|---|
| 512 44TH ST | ORANGE | O | 43 | PHONE |

**Dispatch Disposition**
RPT

## Classification

*Classification Info*                                     **COMPLETED**

**Class**                                                **Subclass**
SEXUAL ASSAULT                                           SEXUAL ASSAULT, SODOMY GIRL STRONGARM

## Suspects

*Suspect Information*

| Name Type | Name |
|---|---|
| SUSPECT | PEDDER, DAVID |

| Address | City | State | Zip | DL No |
|---|---|---|---|---|
| 512 S 44TH | ORANGE | TX | 77630 | 09635826 |

| DL State | DOB | SEX | RACE | EO | Res Phone |
|---|---|---|---|---|---|
| TX | 01/23/1963 | M | WHITE | NON-HISPANIC | 330-2954 |

## Victims

*Victim Information*

| Name Type | Name |
|---|---|
| VICTIM | JUVENILE, JUVENILE |

| DOB | SEX | RACE | EO |
|---|---|---|---|
| 07/03/1997 | F | WHITE | NON-HISPANIC |

## Other Involved

*GUARDIAN Information*

| Name Type | Name |
|---|---|
| GUARDIAN | CHALOUPKA, BAILEIGH C |

| Address | City | State | Zip | DL No |
|---|---|---|---|---|
| 3198 BRENT DR | ORANGE | TX | 77632 | 22593189 |

| DL State | DOB | SEX | RACE | EO | Res Phone |
|---|---|---|---|---|---|
| TX | 06/14/1989 | F | WHITE | NON-HISPANIC | 882-4442 |

*OTHER INV Information*

**EXHIBIT**
tabbies
Y

| Name Type | Name | | | | |
|-----------|------|--|--|--|--|
| OTHER INV | PETTER, CHERYL | | | | |
| City | State | DL No | DL State | DOB | SEX |
| ORANGE | TX | 09673558 | TX | 08/27/1963 | F |
| RACE | EO | Res Phone | | | |
| WHITE | UNKNOWN | 454-3649 | | | |

## OTHER INV Information

| Name Type | Name | | | | |
|-----------|------|--|--|--|--|
| OTHER INV | BISHOP, WILLIAM | | | | |
| Address | | City | State | Zip | DL No |
| 123 CR 4228 | | ORANGE | TX | 77632 | 16939037 |
| DL State | DOB | SEX | RACE | EO | Res Phone |
| TX | 10/23/1980 | M | WHITE | NON-HISPANIC | 746-9317 |

## OTHER INV Information

| Name Type | Name | | | | |
|-----------|------|--|--|--|--|
| OTHER INV | HOLDEN, CHRISTINA DAWN | | | | |
| Address | | City | State | Zip | DOB |
| 123 COUNTY ROAD 4228 | | ORANGE | TX | 77632 | 10/29/1986 |
| SEX | RACE | EO | Res Phone | | |
| F | WHITE | UNKNOWN | 746-9317 | | |

## RPTG PARTY Information

| Name Type | Name | | | | |
|-----------|------|--|--|--|--|
| RPTG PARTY | COBB, CHUCK | | | | |
| Address | | City | State | Zip | DL No |
| 507 44TH ST | | ORANGE | TX | 77630 | 01227196 |
| DL State | DOB | SEX | RACE | EO | Res Phone |
| TX | 02/18/1970 | M | WHITE | NON-HISPANIC | 853-2252 |
| Busn Phone | | | | | |
| 983-8600 | | | | | |

## Property

### EVIDENCE

| Date Reported | Status | Bin/Tag No | Evidence Item No. | Property Type |
|---------------|--------|------------|-------------------|---------------|
| 05/30/2010 | EVIDENCE IN CUSTODY | 55550 | 1013174-1 | RECORDING, AUDIO/VIDEO |
| Model/Desc | Date Rec./Rec. | Recovered Value | Property Location | Property Quantity |
| DVD | 05/31/2010 | $0 | LOCKER # 22 | 1 |

### EVIDENCE

| Date Reported | Status | Bin/Tag No | Evidence Item No. | Property Type |
|---------------|--------|------------|-------------------|---------------|
| 05/30/2010 | EVIDENCE IN CUSTODY | 55552 | 1013174-2 | RECORDING, AUDIO/VIDEO |
| Model/Desc | Date Rec./Rec. | Property Location | Property Quantity | |
| INTERVIEW DVD OF WILLIAM BISHOP II | 06/02/2010 | LOCKER # 22 | 1 | |

## Narrative

Written By:
COWART, CHRISTOPHER

**OFFICER C.D. COWART #452-1026 / PATROL #56 / AGGRAVATED SEXUAL ASSAULT OF A CHILD**

On 5/30/10 approximately 7:40 p.m., I was dispatched to 407 44th St. in reference to a possible report of sexual assault to a child. Upon my arrival I made contact with Chuck Cobb. I know Chuck Cobb to be a Peace Officer and he informed me that he had been approched by a neighbor who had questions involving sexual issues regarding a juvenile.

I initiated an investigation based on that report.

---

**Supplemental Narrative**

| Date Written: | Written By: |
|---|---|
| 05/31/2010 | COWART, CHRISTOPHER |

**OFFICER C.D. COWART #452-1026 / PATROL #56 / AGGRAVATED SEXUAL ASSAULT OF A CHILD**

On 5/30/10 approximately 7:40 p.m., I was dispatched to 407 44th St. in reference to a possible report of sexual assault to a child. Upon my arrival I made contact with a David Pedder (1/23/63) and Chuck Cobb (2/18/70). Mr. Pedder stated that he had contacted Cobb because he was a Peace Officer, and had a question involving sexual issues of a juvenile.

When I talked to Mr. Pedder, he informed me that he knew about sexual activity between his stepson, William Bishop II (10/23/80), and "Mary Smith"-(pseudonym) (7/3/97). Mr. Pedder said that he got her a job at Bakers Transmission on Saturdays cleaning the shop. He said that "Smith" and he had discussed her sexual activity on occasions, and she told him that she had been sexually active since the age of eleven. He stated that she said that he knew of one person she had been involved sexually with personally, and told him the individual was his stepson William. Mr. Pedder said that at that point "Smith" said that she needed to be spoiled, and if she told on William he could go to jail. Mr. Pedder said at that point he started giving her money to keep her quiet until she asked for a dirt bike about two weeks ago. Mr. Pedder said that he went to go look at dirt bikes, but finally had to tell "Smith" that he could not afford that much. He said that he confided in Officer Cobb, but Officer Cobb said that he could not keep that confidential and had to report it.

While I was speaking to Mr. Pedder, his wife Ms. Pedder drove up and exited the car in an aggravated manner. She asked him how could he do that to a young girl, and called him a child molester. I told Ms. Pedder that if she had anything to tell me, I would be more than happy to meet her and "Smith" at the Orange Police station. I then furthered my conversation with Mr. Pedder and told him that since there was so information to please write a statement and someone would return to pick it up when it was completed.

When I arrived at the police station, I made contact with Ms. Pedder, William Bishop II, and Christina Holden ("Smith's" aunt). They stated that "Smith" was scared to come to the police station, but later arrived with Baileigh Chaloupka. Chaloupka is the girlfriend of "Smith's" uncle Frank Holden, who "Smith" is currently living with. Ms. Pedder told me that everything peaked today when she found out that "Smith" was working at Bakers Transmission, and Ms. Pedder had told Mr. Pedder not to be alone with "Smith". Ms. Pedder said that she was on the way to meet with "Smith" because "Smith" was going to tell her everything that was going on between her and him.

Captain Longlois and I met with "Smith" and asked her want happened between her and Mr. Pedder. She stated that Mr. Pedder had sex with her at Bakers Transmission about 3-4 weeks ago on the floor of the shop. She said that he told her to take her pants off, lie down,

and she would like it. "Smith" said that Mr. Pedder would pick her up on Saturdays to go work at the shop to clean up. When "Smith" was asked if Mr. Pedder penetrated her vagina with his penis, "Smith" said yes that Mr. Pedder did penetrate her vagina with his penis. "Smith" said that this was the first time this occasion happened, did not happened anymore. "Smith" said that she did not go back the next Saturday after the occurrence. After this statement was made, Detective G. Keaton was contacted, and turned over to the detective division

## Supplemental Narrative

| Date Written: | Written By: |
|---|---|
| 05/31/2010 | KEATON, G |

Detective Sergeant G.D. Keaton Jr. 447/897

On 05-30-2010 at 2145 hrs., I was the On-Call Detective and received a call-out to 201 8th Street in reference to an aggravated sexual assault of a child. Upon my arrival, I met with Officer C.D. Cowart. Officer Cowart stated he had been dispatched to 407 44th Street in reference to a possible sexual assault of a child which had occurred on a previous date. Officer Cowart stated he met with Port Arthur Police Department Police Officer Chuck Cobb and with David Pedder. Officer Cowart stated Pedder advised he had contacted Officer Cobb, who happens to be Pedder's nearby neighbor, because Pedder knows Cobb to be a police officer and Pedder had a question involving sexual issues of a juvenile.

Officer Cowart stated when he spoke with Pedder, Pedder stated he knew about sexual activity between his stepson, whom he identified as William Bishop II and "Mary Smith" (PSEUDONYM). Pedder stated he had gotten "Smith" a job at Baker's Transmission cleaning the shop on Saturdays. According to Officer Cowart, Pedder stated "Smith" and he had discussed her sexual activity on occasions and "Smith" had told him she had been sexually active since she was eleven years old. Pedder advised the officer "Smith" said Pedder knew of one person, with whom she had been sexually active, personally and told him the individual was Pedder's step-son, William Bishop II. Pedder advised Officer Cowart it was at that time "Smith" advised Pedder she needed to be spoiled and if she told on Bishop, Bishop could go to jail. Pedder advised the officer Pedder started giving her money to keep her quiet until she asked for a dirt bike about two weeks ago. Officer Cowart stated Pedder advised him Pedder had gone to look at dirt bikes, but finally told "Smith" Pedder could not afford that much. Officer Cowart stated Pedder confided in Officer Cobb, but Officer Cobb stated he would not keep such information confidential and would report it.

Officer Cowart stated while he was speaking with Pedder, Pedder's wife drove up, exited the car in an aggravated manner and asked Pedder how could he do that to a young girl, calling him a hcild molester. Officer Cowart advised Ms. Pedder he would meet with her at the Orange Police Station, then turned his attention back to D. Pedder, providing him with statement forms so Pedder could provide a written statement. That statement was made and was later provided to me. I made a copy of the statement to include with the case file and placed the original statement into Records.

At the police station, Officer Cowart stated, he met with Ms. Pedder, William Bishop II and Christina Holden, who is "Smith's" aunt. Officer Cowart stated they advised him "Smith" was scared to come to the station, but she later arrived with Baileigh Chaloupka, who is the girlfriend of Frank Holden, "Smith's" uncle, with whom "Smith" is currently living. Officer Cowart stated Ms. Pedder advised him she had found out "Smith" was working at Baker's Transmission and she had told her husband not to be alone with "Smith." Ms. Pedder had

stateded she was on the way to meet with "Smith" because "Smith" was going to tell her everything that was going on between her and D. Pedder.

Officer Cowart stated he met with "Smith" and asked her what happened between her and D. Pedder. "Smith" stated Pedder would pick her up on Saturdays to go to the shop to clean. "Smith" advised the officer Pedder had sex with her at Baker's Transmission about 3-4 weeks prior on the floor of the shop. "Smith" told Officer Cowart Pedder told "Smith" to take her pants off, lie down, and she would like it. Officer Cowart stated when "Smith" was asked if Pedder penetrated her vagina with his penis, she replied "Yes," he had penetrated her vagina with his penis. Officer Cowart stated "Smith" advised him it had not occurred before that time nor since.

After speaking with Officer Cowart to become acquainted with the case, I met with the victim. The victim advised me she wanted to provide a written statement about the incident. I escorted her to Interview Room 254. The victim stated she did not want to have any of her relatives with her while she gave the statement. The victim was advised she could use a pseudonym if she wished and she stated she would like to do so, in order to maintain some semblance of privacy, and chose the pseudonym "Mary Smith."

Beginning of "Mary Smith's" statement:

My name is Mary Smith. I am a white female that is 12 years of age, being born on the 03rd of July, 1997. I live at 3198 Brent Drive in Orange, Texas. My telephone number is 409-882-4442.

I am giving this statement to G.D. Keaton Jr., who has identified himself to me as a Detective Sergeant with the City of Orange Police Department, Orange County, Texas. This statement is in reference to a sexual assault which occurred on or around 05-08-2010.

About six or seven weeks ago David Pedder asked me if I wanted to make a little extra money by cleaning the shop where he works. David works at Baker Transmission in Orange, Texas. Don Freeman, the owner of the shop, was okay with me coming in for a few hours on Saturdays, so I would ride with David to the shop at 8:00 a.m. and usually work until 11:00 a.m. or maybe until noon, but no later than noon. When I finished work, David would take me home. Mr. Freeman paid me $30.00 for each Saturday I worked and David paid me $20.00, so I made $50.00 for each day.

One Saturday, after a couple of weeks working there, I was at the shop and David Pedder asked me if I would have sex with him. I told him "No." He asked me why not, and I told him "Just because." He asked me again the following Saturday and I told him no again. The following week, when he asked me again, I felt intimidated. I was scared that if I told him no again, something bad might happen to me or to someone I am close to, so I said "Okay, whatever." David started telling me he loved me and asked me if I loved him. I told him yes, I loved him, hoping if I told him that, he would leave me alone.

David took me into one of the offices, one of the rooms behind the actual shop room where the cars are. It was just after we got to work that day and there was nobody else there at the time. He had me take off my pants and I was not wearing panties. I laid down on the rug in the office and he took off his pants. When David took off his pants, his penis was already hard. He got down on his knees and took his time putting his penis into me. It did hurt when he put it in. David had sex with me and I don't know how long it lasted, but it was not a long time.

When he was done, David got up and put his pants back on. I put my pants on and went back to work cleaning and just trying not to think about what happened. David drove me home from work and I worked the next Saturday, but that was the last day I worked. The last day I worked was the Saturday after school let out in Deweyville. I think that last day was May 22. Before we left the shop on May 22, I told Mr. Freeman I was quitting. He didn't aske me why I was quitting. David drove me home when we were done working. When I got home, I told Christina Holden, who I was living with at the time, I was quitting. When she asked me why I was quitting, I just told her I was tired of working there. I didn't tell anybody about what happened.

On Sunday, May 30, I was at McFaddin Beach fishing with Frank Holden, Christina Holden's brother, and a few other people. When we were coming home, we went to a friend's house in Deweyville so Tamitha, I think her last name is Tompkins, could change into dry clothes. Frank called Tamitha and said we needed to go to Christina Holden's. We went to her house and my Paw Paw was there with my cousin Misty Holden and Christina's two boys. Misty and I took a walk and we walked down the road. Someone at the house yelled to me and said I had to go with Tamitha to Baileigh Chaloupka's house, which is where I currently live.

We went to Baileigh's house and she told me to get in the car and we came to the police station. Baileigh said I had to make a statement. She asked me if anyone had ever touched me and made me promise I would tell the truth. Everybody seemed to know about what happened and it all just seemed to happen today. I didn't know how anybody else found out."

End of "Mary Smith's" statement.

The juvenile signed the statement, in the name of "Mary Smith," in my presence. A copy of the statement was made for the case file while the original was placed into Records.

While I was speaking with "Smith," I noticed she frequently stopped speaking, appearing to be overcome with emotion. Several times she was crying and shaking as she spoke. I did my best to reassure her she was safe and it was okay to speak with me. "Smith" stated she had never had sexual intercourse with anyone else, either before or after that incident. "Smith" stated she only had sexual intercourse with Pedder and only had it with him that one time. I did specifically ask her if she had ever had sexual contact with William (B.J.) Bishop, as it had been stated by the suspect, David Pedder, that "Smith" had been sexually active with Bishop. "Smith" emphatically replied she had not and that Bishop had never approached her or spoke to her in a sexual nature.

After speaking with "Smith," I escorted her back to the Orange P.D. report room, where she met up with Baileigh Chaloupka, with whom she currently lives. "Smith" left in the company of Chaloupka. Contact was not made at that time with "Smith's" mother, as "Smith" did not have contact information for her, although Chaloupka did state her mother is around and Chaloupka does not currently have anything in writing showing her as "Smith's" guardian. Chaloupka has since filed a report with Child Protective Services. On 06-03-2010 I made contact with CPS case worker Sean Martin, who has made contact with "Smith's" mother, Athena Johnson. Martin stated an emergency plan is in the works and Johnson is being very cooperative and will allow CPS to enable Chaloupka to seek any medical or other assistance in the protection of "Smith."

Once "Smith" left with Chaloupka, I went to 512 S. 44th Street and made contact with the subject who identified himself as David Pedder. Pedder agreed to accompany meet with me

at the Orange Police Department in order to provide a statement. Once at the Orange Police Department, I escorted Pedder to an interview room. I left Pedder alone for a brief time while I began the DVD recording for that room. Upon returning to the room, I informed Pedder I would like to gather his statement and needed to advise him of his rights. I did this even though Pedder was not in custody.

While reading Pedder his rights, which I read verbatim from page one of the Voluntary Statement, Pedder initialled beside the first two rights, indicating he understood those rights. Upon being informed of number three, which advises of the right to have an attorney present prior to and during any questioning, Pedder stated he wanted his attorney present. At that point, I did not ask any questions and gave Pedder the opportunity to contact his attorney. Pedder stated his attorney was Blaine Goins and he placed a call from his cell phone to his attorney. Pedder left a voicemail on the phone. Pedder did make the res gestae statement "I know what I did wrong. I was trying to protect a family member." I then left the room for several minutes.

Upon my return to the room, I asked Pedder if he had contacted his attorney and was informed he had tried again, but did not reach him. I asked Pedder if he wanted to speak with me anyway at that time, to which he replied "Yeah. I can stop at any time." At that time, I read Pedder the rest of his rights verbatim from page one of the Voluntary Statement. Pedder initialled beside each right, indicating he understood each right. Pedder also signed the bottom of page one, indicating he wished to waive his rights and provide a statement at that time.

At that time, I began speaking with, and listening to David Pedder. I did not write or type anything into the statement at that time, as I was trying to get a good understanding of what he was saying. Pedder mentioned his wife, Sheryl, calling him and mentioning to him she had heard "Smith" had quit working at Baker's Transmission and was upset because she didn't even know "Smith" had been working there. Pedder stated his wife told him she was going to talk to "Smith." Pedder also stated "If she says something about your son we need to get straight because I'm just as involved as he is."

Pedder mentioned one time he was taking the victim to work and sat out in the parking lot there speaking with her. Pedder stated the victim mentioned about BJ and Christie (BJ was identified as William Bishop II, from whom a statement was later obtained) asking her if Pedder was "messing" with her. Pedder stated when he asked why BJ would ask, she advised "Because he knows I'm not a virgin." Pedder asked her if she had been going around with little boys and said she advised no and that her oldest had been 39 years old. Pedder asked how she ended up with a 39 year old guy in Deweyville, but did not state why he thought it was in Deweyville. Pedder stated "Smith" also stated she had sexual contact with Bishop, one time while going hunting in the national forrest, specifically manually masturbating Bishop. Pedder stated "Smith" told him it happened a second time and the two had gotten high "Smith" stated Bishop "whooped it out and I started jacking him off and he started fingering me, but it hurt because his hands were rough." Pedder immediately followed that up by stating "I said 'Okay, well that's because he is a carpenter.'"

During the time he was speaking to me, Pedder kept his arms crossed for the vast majority of the time. He did not seem to be emotionally involved in the statements he was making and avoided making eye contact with me, often looking down.

Pedder went on to state "Smith" had indicated she may have had sexual relations with several other persons. During the conversation, Pedder mentioned trying to get ahold of Bishop, to whom he usually referred as BJ, in order to tell Bishop. Pedder stated "Smith"

mentioned she was 'spoiled'. Pedder stated he asked her if he gave her money, would she not say anything about BJ, and that he, Pedder, gave "Smith" $20.00 in addition to her weekly money she received from Baker's Transmission. Pedder advised he finally quit giving "Smith" money when she began being interested in getting a dirtbike and implied she wanted him to provide it to her.

While speaking with Pedder, I did directly state to him "The story I'm getting is that you had sex with this girl." When I stated that, I observed Pedder to nod his head front-to-back several times, which I usually associate with the positive or "yes." While nodding his head, Pedder still had his arms crossed across his chest and stated "Right. That's what my wife said when she came out there." I again stated "That's pretty much the story I'm getting." Pedder, still nodded and stated "Right." I then asked Pedder directly "You're telling me you never had sex with this girl?" At that time Pedder shook his head back and forth, which I usually associate with the negative or "no," and stated "No sir. Only thing I did was cover up for my step-son." Pedder later became irritated with my speaking with him and stated he wanted to have his lawyer. At that time I stopped speaking with him about the incident. I stopped the recording for the interview room and drove Pedder back to his residence. I did make a copy of the recording for the case file, while the original was was entered into evidence. The Voluntary Statement form, which Pedder had initialled and signed, was submitted into Records even though there was no actual written statement, and a copy of the signed form was placed with this case file.

I obtained a handwritten statement from Baileigh Chaloupka. Chaloupka is the first person the victim is believed to have spoken about the incident. As she is a legal adult and believed to be the first person to whom the victim has spoken about the incident, I believed her statement to be materiel to the case as being an 'Outcry.' The statement is included below, with the only change made by me being the victim's true name has been changed in this report to the PSEUDONYM of "Mary Smith," which the victim chose to use in order to protect her privacy and identity.

Beginning of Baileigh Chaloupka's handwritten statement:

"On May 30, 2010 "Mary Smith" my niece and I, at 8:30 we were going to the police station so "Mary Smith" could make a statement about David melesting her "Mary Smith" got in our car and I said "Mary Smith" did David touch you in any innaproprate way She started crying and repeating I was scared I ddint know what to do he asked me to have sex with im and I was scared he was going to hurt me if I didnt I then asked "Mary Smith" did David have sex with her she said yes. I then asked her if any body had ever asked her if any body else had touched her she was crying hysterically she said no thats the first person to ever touch her in any way I do believe "Mary Smith" when she told me this she has no reason to lie or make something up like this she was very upset and crying uncontrollably."

End of Baileigh Chaloupka's handwritten statement.

A copy of Chaloupka's statement was made for the case file while the original was placed into Records.

I also obtained a handwritten statement from Officer Charles "Chuck" Cobb, who is employed by Port Arthur Police Department. Officer Cobb was off-duty at the time he was approached by Pedder and stated Pedder approached him because he knows Cobb to be a police Officer. Officer Cobb's statement was written at 2215 hrs. on 05-30-2010.

Beginning of Officer Cobb's handwritten statement:

"On todays date at 6:59 pm I received a cellular call from my neighbor Dave Pedder at 512 S. 44th St. He advised that he needed to ask me a police related question. I walked across the street to his driveway. Pedder advised that he had screwed up + wanted to straighten things out. He said that a 13 year old female had been working at the mechanic shop where he is employed. Pedder said that approx. 3 weeks ago she told him that she had been having sexual contact with Pedders stepson William (B.J.) Bishop II. Pedder said that the detail she told him made him think she was telling the truth. Pedder said that because of Bishop having 2 small children Pedder began paying the girl to keep quiet about the sexual contact. After a couple of weeks, Pedder said the girl began wanting a motorcycle instead of cash. Pedder said that he couldn't afford that + when he told her no she said that it was O.K. because she was moving in with someone else. Pedder said that his wife called him earlier on todays date + told him that she was going to Deweyville because this girl was making some sort of claim aqbout him. Pedder said he didn't know what the girl was saying but he wasn't going to keep quiet about Bishop any longer + that was when he called me. I told Pedder that him ttelling me that a Juvenile making an outcry + authorities had not been notified left me no choice but to call Orange P.D. I called Orange P.D. + Officer Cowart came to speek with Pedder + obtain a witness statement. I then came to Orange P.D. to give this statement."

End of Officer Cobb's handwritten statement.

A copy of Officer Cobb's statement was made for the case file while the original was submitted to Records.

Officer Cowart provided me a statement which had been handwritten by Sheryl Pedder.. A copy of that statement was included in this case file while the original was placed into Records. Officer Cowart also provided a statement which had been handwritten by David Pedder. The statement was very difficult to understand due to the grammar and flow of writing, but it did mention "Smith" stating she had sexual contact with several persons and that Pedder did not report it. A copy of that statement was made and included with the case file while the original was placed into Records.

On 06-02-2010 at 1525 hrs., I met with William Frank (B.J.) Bishop II at the Orange Police Department. Bishop stated he had recently been involved in a disturbance at 404 Green, Baker's Transmission, as he went to speak with his step-father, David Pedder, about Pedder allegedly having sexual intercourse with "Smith." I escorted Bishop to Interview Room 257. Since Pedder had accused Bishop of having sexually assaulted "Smith," even though Bishop was not in custody, when I spoke with him to begin the statement, I read Bishop his Miranda warnings from page one of the Voluntary Statement. Bishop initialled beside each right, indicating he understood each right. Bishop also signed the bottom of page one of the Voluntary Statement, indicating he wished to waive his rights and provide a written statement. This statement was also recorded on DVD.

In this written statement within this report, the only change made is I have inserted "Mary Smith," the PSEUDONYM chosen by the victim, into Bishop's statement in those places where he used her true name. This has been done solely to protect the privacy and identity of the victim.

Beginning of William Bishop's statement:

"On 05-30-2010 My fiancee, Christina (Christie) Holden, and were at my mom's house (Sheryl Pedder) before heading out fishing. While we were at my mom's house we were

talking and it came up in conversation that my fiancee's niece, "Mary Smith," was not working with David any more. David Pedder is my mom's husband and my step-father. David is a mechanic at Baker's Transmission and "Mary Smith" had been working there on Saturday's cleaning the shop for extra money. My mom was upset since she didn't even know "Mary Smith" had been working there and David had never mentioned anything to her about it. She asked about what else "Mary Smith" had done with David, and I told her I knew she went to the races with him. My mom said she didn't know anything about that either since David didn't tell her. My mom told me David said he was just going with some of the guys from work and never mentioned anything about "Mary Smith" or anyone else going. I knew she had gone since David had called and asked me and Christie if "Mary Smith" could go since "Mary Smith" had been staying with us at the time.

When my mom found out about the races, she was upset David had been keeping things from her. Christie and I left to go fishing and my mom ended up calling David. Christie and I went back to our house after returning from fishing and my mom came over to my house told me she had called David to ask him why she hadn't heard anything about "Mary Smith" working there or her going to the races with David. My mom told me she had to go charge her phone at her house because it was going dead, but I didn't think that is what she was going to do. I was afraid she was going over to David's house to confront him. She ended up going over there and I was heading that way when I got a call from my mom telling me David was accusing me to the police of touching "Mary Smith."

I told her I was going straight over to the police station to get this addressed. We all met up and came over to the police station together, meaning myself, Christie, my mom and my friend Perry. After we got here, "Mary Smith" came to the station with Baileigh Chaloupka. Baileigh lives with Frank Holden, who is "Mary Smith's" uncle. "Mary Smith" had just moved out of our house a few weeks ago and moved in with Baileigh and Frank. The officer said he did not need a statement from me at that time, but I assumed I would need to speak with the detective since David had accused me.

"Mary Smith" had lived with me and Christie on and off for about three years. She would occasionally move out to live with her mom, Athena Johnson, or her sister, Heather. For the most part, though, she lived with us. I know David accused me of having sex with "Mary Smith," but I have never had sex with her. I have never touched her inappropriately, never said any inappropriate language to her, never had any sexual thought about her. Those accusations are complete fabricated lies. She is just like my own boys to me. I've been her father figure for three yers. We treat her like she was our kid.

I've had suspicions before. "Mary Smith" (La La) would sometimes go hunting with us. Sometimes I'd go by her stand and she'd be gone when I went to pick her up. I went by the truck and she was sitting at the truck with David. She'd said David came out early and she had just been out there for a few minutes. I asked her later than night if David had ever done or said anything, touched her or anything, and she told me he had not. I still had suspicion, but didn't have proof of anything.

The night we came to the police station, "Mary Smith" came back in the room with us and she told us David had had sex with her. That was the first time I had ever heard it, although I did have those suspicions. "Mary Smith" also said something about having sent David dirty pictures on her cell phone a few months ago, but she had already deleted those pictures. "Mary Smith" has lied about little things before, just like any kid, to keep out of trouble, but she has never lied about anything important before and I have no reason to believe she is lying to anyone about this. She was completely distraught and crying while taking with us that night, so I don't believe she is making this up. I've never seen her that

upset about anything before. I believe her when she says she had sex with David."

End of William Bishop's statement.

William Bishop signed the statement in my presence. A copy of the statement was made for the case file while the original was placed into Records. A copy of the interview DVD was made for the case file while the original was placed into evidence.

While speaking with William Bishop, it appeared as though he maintained an open demeanor. He was active in the conversation, maintaining good eye contact with me, keeping his arms open instead of crossing them across his chest. Bishop showed interest and concern for the child while speaking with me.

## 06-04-2010

Several incidents have occurred since the initial call-out I received on 05-30-2010. The incidents included welfare concerns and disturbances, with the most serious incident being a suicide attempt by David Pedder on 06-02-2010 (Event # 1013479). The report completed by Capt. Stephenson for that event has been included with this case file. In his report, Capt. Stephenson stated he found several envelopes, two of which were inside the truck in which he attempted suicide and four of which were found inside Baker's Transmission. I obtained copies of the letters, which were inside the envelopes, from Evidence and included those copies with the case file while the originals were retained in evidence. The envelopes all had names or statements on them, presumably stating what they were or to whom they were intended. The envelopes were labelled as follows: Going Lawyer 882-9494, My Last Will David Pedder, La La, Don Freeman, Steve Neal, Latisa and Kids Bank Card, To Tisa Candice Brandy David, and Orange PD.

I was able to meet with Don Freeman, owner of Baker's Transmission, who provided a written statement regarding this incident. For the purposes of this report narrative, I have changed the victim's name to that of "Mary Smith," the PSEUDONYM chosen by the victim. The original statement was placed into records and a copy of the statement was made for this case file. Those statements remain in their original form as written.

Beginning of Freeman's statement:

"I was asked to make a statement in regard to our conversation about David Pedder and "Mary Smith" bot of which worked in my shop. Dave came to work for me about a year and a half ago. He has been a model employee and an asset to our shop. Over the years we have had different people work cleaning the shop. One was a boy from Orangefield that was the sone of a friend of Dave's. About four months ago, Dave asked if "Mary Smith" could come to work for us. He explaied that she was living with his step-son William Bishop and his wife which is "Mary Smith's" aunt. Her working here would help th estep=son and "Mary Smith" by giving her money to help the family. "Mary Smith" did a good job. She actually did better than most. She worked from 8:00 o'clock until 12:00 o'clock on Saturday. She was paid $30.00 durign the time frame we discussed. I was present during the working hours of 8 to 12. We did business as usual. I noticed nothing out of the ordinary."

End of Freeman's statement.

While I spoke with Freeman, he advised he was only out of the shop on one Saturday in recent memory, that being back in April 2010, at which time he was at a race. Freeman

stated he was present in the shop during each Saturday in May and that "Mary Smith" never told him anything had happened. Freeman advised me he did not notice either "Mary Smith" or David Pedder acting unusually around him or around each other and that he, himself, had never seen or suspected anything unusual. Freeman advised his shop is a family owned business which has a good reputation which he is trying to uphold and if he had heard, or had reason to believe, Pedder had done anything he would have immediately notified law enforcement.

On 06-04-2010 at 1330 hrs., I went to Child Abuse & Forensic Services, 810 Hospital Drive Suite 190, Beaumont, Texas, where I spoke to Brenda Garrison, RN. Garrison is a certified Sexual Assault Nurse Examiner (SANE). I was met there by Baileigh Chaloupka and "Mary Smith." Garrison conducted the SANE exam on "Mary Smith." Garrison advised me she would forward her report to me once it is written. Garrison stated during the exam, she found that "Mary Smith" had healed tearing on her hymen at the seven o'clock position. Garrison advised me there was no semen, DNA or other physical evidence present so an evidence kit would not be provided. Garrison stated it was not possible to determine how long ago the tearing occurred nor was it possible to determine what, specifically, caused the tearing, although she stated the healed tearing is consistent with sexual activity or penetration of the sexual organ.

**06-09-2010**

On 06-09-2010 I received the faxed report from Brenda Garrison. The written report supported the verbal statements Garrison made on 06-04-2010, specifically stating in Section VII: "Healed tear at 7 o'clock position to hymen- consistent with penetration of the female sexual organ."

As of 06-09-2010 David Pedder is still under medical care for the suicide attempt and no further attempts have been made at contacting him.

**This case is being forwarded to the DA's office.**

| Supplemental Narrative | |
|---|---|
| Date Written:<br>08/16/2010 | Written By:<br>KEATON, G |

Detective Sergeant G.D. Keaton Jr. 447/897

This case was reviewed at the DA's office by Orange County District Attorney J.D. Kimbrough on 06-21-2010. The DA returned this case to me as "Temporarily Rejected" and asked for additional information to be gathered. I met with the DA to discuss the case in greater detail and to get clarification on what information the DA was requesting. While speaking with the DA, it was determined the original statement by the victim, including the pseudonym used referring to the victim in all of the statements, would remain.

I do verify that all references to "Mary Smith" or statements made by "Mary Smith" regarding this case all refer to the victim, Alahna Apodaca.

The DA requested an additional statement from Sheryl Pedder, clarifying some of the comments made in her previous statement. I was specifically instructed to address information regarding trips taken or gifts bought by David Pedder for the victim. The DA

also requested an additional statement from Baileigh Chaloupka, clarifying the initial "outcry" made by Alahna Apodaca.

On 08-16-2010 at 0920 hrs., I met with Sheryl Pedder at the Orange Police Department. Sheryl Pedder agreed to provide the additional statement.

Beginning of Sheryl Pedders' statement:

"My name is Sheryl Pedder. I am a white female that is 46 years of age, being born on the 27th of August, 1963. I live at 123 CR 4228 in Orange, Texas, 77632. My cell phone number is 409-330-0625. This statement is in reference to an aggravated swxual assault which occurred around 05-08-2010.

In my original statement, I mentioned my husband, David Clifford Pedder, having bought items for Alana Apodaca and having taken her on trips to the races. I had heard David was buying her things, but did not know exactly what it was he bought her. I had heard he took Alana to the races, which David admitted to having done after the fact. I usually went with David to the races, but he had said this particular time was going to be a "guys night out," so I did not go with him on that trip. I found out that David took her to the races after I spoke to my son, William Bishop ( "BJ" ). Alana was living with BJ and his girlfriend, Christina, at that time. BJ had said David had stopped over to ask if Alana wanted to go. I do not remember exactly what date that was, but it was sometime in either late April or early May 2010.

BJ and Christy have told me David would bring dinner over there or just drop by to visit, but David never mentioned any of that to me. I believe David was just doing that to try to get close to Alana and make it look like he was just trying to be friendly. We did go on numerous hunting trips up in Fairmont this past year during hunting season and Alana went with us. During a couple of those trips, I do remember Alana and David not being in their deer stands and being at the truck alone. The areas David and Alana hunted in were close to each other and David was usually the one who drove us to our stands, so he made a point of usually dropping everybody else off at their stands, then dropping Alana off last. I believe he was doing that just to be alone with her."

End of Sheryl Pedders' statement.

Sheryl Pedder signed the statement in my presence. A copy of the statement was made for the case file while the original was placed into Records.

On 08-23-2010 I was able to meet again with Baileigh Chaloupka. Chaloupka agreed to provide an additional statement in order to address it being an "outcry" statement.

Beginning of Baileigh Chaloupkas' statement:

"My name is Baileigh Chaloupka. I am a white female that is 21 years of age, being born on the 14th of June, 1989. I live at 3198 Brent Drive in Orange, Texas, 77632. My cell phone number is 409-882-4442.

I am giving this statement to G.D. Keaton Jr., who has identified himself to me as a Detective Sergeant with the City of Orange Police Department, Orange County, Texas. This statement is in reference to an aggravated sexual assault which occurred around 05-08-2010.

On May 30, 2010, we had all been to the beach. My niece, Alahna Apodaca, who was twelve years old at the time, was ridign home with a friend of mine. I received a telephone call from my sister-in-law, Christina Holden, in which she told me she had been called by Sheryl Pedder. Sheryl Pedder is the wife of David Pedder, a man Alahna had worked with on weekends at Baker's Transmission. Sheryl had told Christina she thought David had had sex with Alahna. As far as I know, Alahna had not had sex with anyone nor had she told anyone she did.

Christina told me they were heading to the police department to make a report. I went andpicked up Alahna around 8:30 pm that night. When I picked up Aahna, we got into my car and were heading to the police station, but I had not told that to Alahna. Alahna dn I were the only ones in the car at that time. I asked Alahna if David had ever touched her inappropriately. She started crying and said she was scared and didn't know what to do. I asked her "Did David have sex with you?" Alahna told me "yes, David had sex with her." I asked her "How many times have you had sex with him?" Alahna told me that was the "only time she ever had sex with David." She also told me she had been afraid David would hurt her if she did not have sex with him. Alahns also told me that was the only time she had ever had sex with anybody.

When I was talking to Alahna, she had already started crying, then the crying got worse. She was very upset. I asked Alahna if anyone else had ever touched her sexually, but she said nobody had ever done so; that David was the only one who has ever touched her sexually. I asked Alahna if she ahd ever told anybodu about what happened, but she told me she had not. I am the first adult to whom Alahna spoke, stating she had been sexually involved with David Pedder. Once we got to the police station, both of us individually provided statements to the police.

I do believe Alahna when she says David Pedder had sex with her. She has no reason to lie or to make anything up. She appeared very upset and was screaming and crying uncontrollably. I really don't think she would have been so upset if anything had not happened."

End of Baileigh Chaloupkas' statement.

Baileigh Chaloupka signed the statement in my presence. A copy of the statement was made for the case file while the original was placed into Records.

**This case is being resubmitted to the DA's Office.**

| Case Management | | | |
| --- | --- | --- | --- |
| Initial Investigator | Followup Investigator | Event Status/Dispo | Event Status/Dispo Date |
| COWART, CHRISTOPHER | KEATON, G | ACTIVE | 05/30/2010 |
| Report Status | | | |
| UPDATED | | | |

2

NO. A100640-R

| STATE OF TEXAS | § | IN THE 260TH JUDICIAL DISTRICT |
| vs. | § | COURT OF |
| DAVID PEDDER, JR. | § | ORANGE COUNTY, TEXAS |

## MOTION TO SUPPRESS ILLEGALLY OBTAINED EVIDENCE

TO THE HONORABLE JUDGE OF SAID COURT:

Now comes KENNETH FUSELIER, defendant in the above styled and numbered cause, and files this Motion to Suppress Illegally Obtained Evidence and shows the following:

1. KENNETH FUSELIER seeks to suppress evidence of alleged contraband, and the identity, statements and testimony which concern the alleged contraband.

2. On or about the date of arrest/offense, law enforcement officials may have executed a search warrant on the premises at ORANGE County, Texas.

3. Certain items may have been seized as a result of the search, including but not limited to matter alleged to be fruits of a crime.

4. Defendant anticipates the seized matters, if any, will be offered to the court as incriminating evidence against defendant.

5. The issuance of the search warrant, if any, the affidavit upon which it was based the executing of the warrant, the return by the officers executing the warrant and the seizure were illegal.

6. Actions of law enforcement officials served to violate the constitutional and statutory rights of the Defendant under the Fourth and Fourteenth Amendments to the United States Constitution, Article 1, section 9 of the Texas Constitution, and Article 38.23 of the Texas Code of Criminal Procedure.

7. Any evidence obtained as a result of the issuance and execution of the search warrant, if any, should be suppressed by the Court and ruled inadmissible in any trial of the charges against defendant.

8. Defendant specifically shows that the search and seizure was illegal, for the following reasons:

    a. the affidavit, if any, upon which the search warrant was based was improperly and illegally executed.

    b. the warrant, if any, was illegally issued for the reason that the supporting affidavit does not reflect sufficient probably cause to justify the issuance of

**EXHIBIT**

Z

a search warrant, in violation of Article, 1 Section 9 of the Texas Constitution, Article 38.23 C.C.P., in that:

    I.      The affidavit, if any, lacks sufficient underlying circumstances which would permit the conclusion that the alleged contraband was at the location in which it was claimed; and

    ii.     The affidavit, if any, fatally fails to state sufficient underlying circumstances to establish the credibility of the affiant.

c.     The warrant, if any, was illegally issued because the affidavit did not show probable cause sufficient to justify the issuance of the search warrant, in violation of the Fourth and Fourteenth Amendments to the United States Constitution, in that the magistrate who issued the search warrant did not have a substantial basis for concluding that probable cause existed, i.e., that the alleged contraband would be found in a particular place, and thus did not meet the totality of the circumstances analysis adopted in Illinois v. Gates, 103 S.Ct.2317, (1983).

d.     The search warrant, if any, was illegally issued in violation of the Fourth and Fourteenth Amendments to the United States Constitution, Article I, Section 9 of the Texas Constitution, and Article 38.23 C.C.P. in that:

    I.      The issuing magistrate failed to manifest the neutrality and detachment demanded of a judicial officer when presented with a warrant application and acted instead as an adjunct law enforcement officer.

    ii.     The issuing magistrate was misled by information in the affidavit, if any, which the affiant officer knew was false or would have known, was false except for his reckless disregard for the truth, in that:

    iii.    The magistrate's probable cause determination reflected an improper analysis of the totality of the circumstances test when, as a matter of law, the probable cause determination was not objectively reasonable.

e.     the seizure was illegal in that the search warrant, if any, was facially deficient, as the search warrant failed to particularize the place to be searched or the things to be seized and, further, the information contained in said warrant was stale.

WHEREFORE PREMISES CONSIDERED, Defendant prays that the court suppress all of the illegally obtained evidence which is described in this motion.

Respectfully submitted,


BRUCE N. SMITH
ATTORNEY AT LAW
2750 IH-10 E
Beaumont, Texas 77703
(409) 899.1046
(409) 899.2648 Fax


By:_____
BRUCE N. SMITH
State Bar No.18543300
Attorney for DAVID PEDDER, JR.

## CERTIFICATE OF SERVICE

This is to certify that on November 14, 2011, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, ORANGE County, by hand delivery.


_____
BRUCE N. SMITH

NO. A100640-R

| STATE OF TEXAS | § | IN THE 260TH JUDICIAL DISTRICT |
| | § | |
| vs. | § | COURT OF |
| | § | |
| DAVID PEDDER, JR. | § | ORANGE COUNTY, TEXAS |

## APPLICATION FOR COMMUNITY SUPERVISION

**TO THE HONORABLE JUDGE OF SAID COURT:**

Now comes DAVID PEDDER, JR., Defendant, and files this application for community supervision and in support thereof shows:

Defendant has been sworn prior to making this application.

Defendant has never been convicted of a felony in the State of Texas or in any other state.

**WHEREFORE, PREMISES CONSIDERED,** DAVID PEDDER, JR. prays that, in the event of conviction herein, the Court grant community supervision to Defendant of any sentence that is imposed.

Respectfully submitted,

BRUCE N. SMITH
ATTORNEY AT LAW
2750 IH-10 E
Beaumont, Texas 77703
(409) 899.1046
(409) 899.2648 Fax

By:_____
BRUCE N. SMITH
State Bar No.18543300
Attorney for DAVID PEDDER, JR.

## VERIFICATION

"My name is DAVID PEDDER, JR.. I have been sworn in making this application and the matters it contains are the truth.

"I have never been convicted of a felony in this state or in any other state:

_____

DAVID PEDDER, JR.

Sworn to and subscribed before me on _____.

_____

NOTARY PUBLIC

NO. A100640-R

| STATE OF TEXAS | § | IN THE 260TH JUDICIAL DISTRICT |
| vs. | § | COURT OF |
| DAVID PEDDER, JR. | § | ORANGE COUNTY, TEXAS |

## MOTION FOR NOTICE AND TO SUPRESS

**TO THE HONORABLE JUDGE OF SAID COURT:**

Now comes, DAVID PEDDER, JR., Defendant, and files this Motion to Suppress Statements and in support would show:

1.     At the time of any conversations between DAVID PEDDER, JR. and law enforcement officers, DAVID PEDDER, JR. was (a) under arrest or (b) substantially deprived of freedom by the conduct of the law enforcement officers and the circumstances surrounding the arrest or deprivation of freedom.

2.     Any statements made by DAVID PEDDER, JR. were involuntary and were coerced and enticed from DAVID PEDDER, JR..

3.     DAVID PEDDER, JR. was deprived of right to counsel and DAVID PEDDER, JR. did not make an intelligent and knowing waiver of that right.

4.     The statements made by DAVID PEDDER, JR. were tainted by the illegal and unlawful detention and arrest, in violation of DAVID PEDDER, JR.'s constitutional rights under the Fifth and Fourteenth Amendments to the Constitution of the United States, Article I, Section 9 of the Texas Constitution and Article 38.23 of the Texas Code of Criminal Procedure.

5.     Statements made by DAVID PEDDER, JR. were taken without the safeguards required by and in violation of Article 38.22 of the Code of Criminal Procedure.

6.     The admission of statements by DAVID PEDDER, JR. is a violation of DAVID PEDDER, JR.'s rights pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article I, Section 9 and 10 of the Texas Constitution and Articles 1.05 and 38.23 of the Texas Code of Criminal Procedure.

**WHEREFORE, PREMISES CONSIDERED,** Defendant prays that the Court hold a pretrial hearing on this motion, and after hearing the evidence order the suppression of any and all confessions and statements taken from DAVID PEDDER, JR..

Respectfully submitted,

BRUCE N. SMITH
ATTORNEY AT LAW
2750 IH-10 E
Beaumont, Texas 77703
(409) 899.1046
(409) 899.2648 Fax

By:_____
BRUCE N. SMITH
State Bar No.18543300
Attorney for DAVID PEDDER, JR.

## CERTIFICATE OF SERVICE

This is to certify that on November 14, 2011, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, ORANGE County, by hand delivery.

_____
BRUCE N. SMITH

## ORDER FOR A SETTING

On _____, 2011, the Defendant filed a Motion to Suppress Statements. The Court finds that the party is entitled to a hearing on this matter, and it is THEREFORE ORDERED that a hearing on this motion is set for _____, at _____.

Signed on _____.

_____
JUDGE PRESIDING

NO.A100640-R

STATE OF TEXAS                    §    IN THE 260TH JUDICIAL DISTRICT
                                  §
vs.                               §    COURT OF
                                  §
DAVID PEDDER, JR.                 §    ORANGE  COUNTY, TEXAS

## O R D E R

On _____, 2011, came on to be considered DAVID PEDDER, JR.'s

Motion to Suppress Statements, and said motion is hereby

(Granted)   (Denied)

_____
JUDGE PRESIDING

NO. A100640-R

| STATE OF TEXAS | § | IN THE 260TH JUDICIAL DISTRICT |
| vs. | § § | COURT OF |
| DAVID PEDDER, JR. | § § | ORANGE COUNTY, TEXAS |

## MOTION TO DETERMINE ADMISSIBILITY OF STATEMENT

**TO THE HONORABLE JUDGE OF SAID COURT:**

Now comes the Defendant, and files this motion to determine the admissibility of statements, and in support thereof would show:

1. This motion is brought pursuant to Article 38.22 (Sections 2 and 6) of the Texas Code of Criminal Procedure.

2. This matter is related to charges brought against DAVID PEDDER, JR. for the offense of Aggravated Sexual Assault .

3. DAVID PEDDER, JR. made a written statement to police officers.

4. The circumstances and the nature of the statement raise the question of the voluntariness of the statement.

5. Article 38.22 (Section 2) of the Code requires that prior to making the statement, DAVID PEDDER, JR. receive a warning from either a magistrate or the person to whom the statement was made that:

a. DAVID PEDDER, JR. had the right to remain silent and not make any statement at all and that any statement made could be used against him at trial.

b. any statement made by DAVID PEDDER, JR. may be used as evidence against him in court.

c. DAVID PEDDER, JR. had the right to have a lawyer present to advise him prior to and during any questioning.

d. if DAVID PEDDER, JR. was unable to employ a lawyer, he had the right to have an appointed lawyer to advise him prior to and during any questioning.

e. DAVID PEDDER, JR. had the right to terminate the interview at any time.

6. The Code requires further that prior to and during the making of the statement, DAVID PEDDER, JR. knowingly, intelligently, and voluntarily waive the rights set forth.

Movant requests that the Court make a determination of whether or not the Code provisions were met in this instance and to determine the admissibility of the statement of DAVID PEDDER, JR..

**WHEREFORE, PREMISES CONSIDERED,** the Defendant prays that the court set this matter for an evidentiary hearing so that a determination may be made as to the admissibility of the written statements of DAVID PEDDER, JR..

Respectfully submitted,

BRUCE N. SMITH
ATTORNEY AT LAW
2750 IH-10 E
Beaumont, Texas 77703
(409) 899.1046
(409) 899.2648 Fax

By:_____
BRUCE N. SMITH
State Bar No.18543300
Attorney for DAVID PEDDER, JR.

## CERTIFICATE OF SERVICE

This is to certify that on November 14, 2011, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, ORANGE County, by hand delivery.

_____
BRUCE N. SMITH

## ORDER FOR A SETTING

On _____, 2011, the Defendant filed a Motion to Determine Admissibility of Statement. The Court finds that the party is entitled to a hearing on this matter, and it is THEREFORE ORDERED that a hearing on this motion is set for _____,

at _____.

Signed on _____.


_____
JUDGE PRESIDING

NO. A100640-R

| STATE OF TEXAS | § | IN THE 260TH JUDICIAL DISTRICT |
| vs. | § | COURT OF |
| DAVID PEDDER, JR. | § | ORANGE COUNTY, TEXAS |

## ORDER

On _____, 2011, came on to be heard the Defendant's Motion to Determine Admissibility of Statements, and after careful consideration of the motion and arguments of counsel, the Court ORDERS that said motion is hereby

(GRANTED)    (DENIED)

Accordingly, the statement in question is ruled to be:

(GRANTED)    (DENIED)

Signed on _____.


_____
JUDGE PRESIDING

NO.A100640-R

| STATE OF TEXAS | § | IN THE 260TH JUDICIAL DISTRICT |
| | § | |
| vs. | § | COURT OF |
| | § | |
| DAVID PEDDER, JR. | § | ORANGE COUNTY, TEXAS |

## MOTION TO SUPPRESS STATEMENTS

TO THE HONORABLE JUDGE OF SAID COURT:

Now comes, DAVID PEDDER, JR., Defendant, and files this Motion to Suppress Statements and in support would show:

1. At the time of any conversations between DAVID PEDDER, JR. and law enforcement officers, DAVID PEDDER, JR. was (a) under arrest or (b) substantially deprived of freedom by the conduct of the law enforcement officers and the circumstances surrounding the arrest or deprivation of freedom.

2. Any statements made by DAVID PEDDER, JR. were involuntary and were coerced and enticed from DAVID PEDDER, JR..

3. DAVID PEDDER, JR. was deprived of right to counsel and DAVID PEDDER, JR. did not make an intelligent and knowing waiver of that right.

4. The statements made by DAVID PEDDER, JR. were tainted by the illegal and unlawful detention and arrest, in violation of DAVID PEDDER, JR.'s constitutional rights under the Fifth and Fourteenth Amendments to the Constitution of the United States, Article I, Section 9 of the Texas Constitution and Article 38.23 of the Texas Code of Criminal Procedure.

5. Statements made by DAVID PEDDER, JR. were taken without the safeguards required by and in violation of Article 38.22 of the Code of Criminal Procedure.

6. The admission of statements by DAVID PEDDER, JR. is a violation of DAVID PEDDER, JR.'s rights pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article I, Section 9 and 10 of the Texas Constitution and Articles 1.05 and 38.23 of the Texas Code of Criminal Procedure.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that the Court hold a pretrial hearing on this motion, and after hearing the evidence order the suppression of any and all confessions and statements taken from DAVID PEDDER, JR..

Respectfully submitted,

BRUCE N. SMITH
ATTORNEY AT LAW
2750 IH-10 E
Beaumont, Texas 77703
(409) 899.1046
(409) 899.2648 Fax

By:_____
BRUCE N. SMITH
State Bar No.18543300
Attorney for DAVID PEDDER, JR.

## CERTIFICATE OF SERVICE

This is to certify that on November 14, 2011, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, ORANGE County, by hand delivery.

_____
BRUCE N. SMITH

## ORDER FOR A SETTING

On _____, 2011, the Defendant filed a Motion to Suppress Statements. The Court finds that the party is entitled to a hearing on this matter, and it is THEREFORE ORDERED that a hearing on this motion is set for _____, at _____.

Signed on _____.

_____
JUDGE PRESIDING

NO. A100640-R

| STATE OF TEXAS | § | IN THE 260TH JUDICIAL DISTRICT |
| vs. | § | COURT OF |
| DAVID PEDDER, JR. | § | ORANGE COUNTY, TEXAS |

## O R D E R

On _____, 2011, came on to be considered DAVID PEDDER, JR.'s

Motion to Suppress Statements, and said motion is hereby

(Granted)   (Denied)

_____

JUDGE PRESIDING

NO. A100640-R

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE 260TH JUDICIAL DISTRICT |
| | § | |
| vs. | § | COURT OF |
| | § | |
| DAVID PEDDER, JR. | § | ORANGE COUNTY, TEXAS |

## MOTION FOR PRODUCTION OF WRITINGS AND STATEMENTS

**TO THE HONORABLE JUDGE OF SAID COURT:**

Now comes DAVID PEDDER, JR., Defendant, and brings this Motion for Production of Writings and Statements pursuant to Rules 612 and 615 of the Texas Rules of Evidence, and in support thereof shows:

1. If a witness uses a writing to refresh memory before or while testifying, an adverse party is entitled to have the writing produced for the purposes of inspection and cross-examination, as provided by Rule 612 of the Texas Rules of Evidence.

2. Furthermore, after a witness other than the defendant has testified on direct examination, the party who did not call the witness can move for the examination and use any statement of such witness in the possession of the opposing attorney that relates to the subject matter concerning which the witness has testified, in accordance with Rule 615 of the Texas Rules of Evidence.

3. Defendant hereby moves for the production of all such writings and statements pursuant to Rules 612 and 615 of the Texas Rules of Evidence.

4. Defendant makes this motion to avoid the possibility of prejudice resulting from the jury seeing documents tendered to Defendant and not being admitted into evidence. Prejudice would result particularly when no cross examination was forthcoming.

**WHEREFORE, PREMISES CONSIDERED,** Defendant prays that the Court order the production of the writings and statements requested hereinabove under Rules 612 and 615 of the Texas Rules of Evidence.

Respectfully submitted,

BRUCE N. SMITH
ATTORNEY AT LAW
2750 IH-10 E
Beaumont, Texas 77703
(409) 899.1046
(409) 899.2648 Fax


By: _____
BRUCE N. SMITH
State Bar No.18543300
Attorney for DAVID PEDDER, JR.


## CERTIFICATE OF SERVICE

This is to certify that on November 14, 2011, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, ORANGE County, by hand delivery.

_____
BRUCE N. SMITH


## ORDER FOR A SETTING

On _____, 2011, the Defendant filed a Motion for Production of Writings and Statements pursuant to Rules 612 and 615 of the Texas Rules of Evidence. The Court finds that the party is entitled to a hearing on this matter, and it is THEREFORE ORDERED that a hearing on this motion is set for _____, at _____.

Signed on _____.


_____
JUDGE PRESIDING

| STATE OF TEXAS | § | IN THE 260TH JUDICIAL DISTRICT |
|---|---|---|
| vs. | §§§ | COURT OF |
| DAVID PEDDER, JR. | §§§ | ORANGE COUNTY, TEXAS |

## ORDER

On _____, 2011, came on to be considered DAVID PEDDER, JR.'s Motion for Production of Writings and Statements pursuant to Rules 612 and 615 of the Texas Rules of Evidence, and said motion is hereby

(Granted)  (Denied)

_____
JUDGE PRESIDING

NO. A100640-R

| STATE OF TEXAS | § | IN THE 260TH JUDICIAL DISTRICT |
| | § | |
| vs. | § | COURT OF |
| | § | |
| DAVID PEDDER, JR. | § | ORANGE COUNTY, TEXAS |

## MOTION FOR VOIR DIRE OF EXPERT WITNESS

**TO THE HONORABLE JUDGE OF SAID COURT:**

Now comes DAVID PEDDER, JR., Defendant in the above styled and numbered cause, and moves this Court to conduct a hearing prior to trial and outside the presence of the jury to determine the preliminary question of the qualification of all expert witnesses upon which the state intends to rely at trial, and to determine the underlying facts and data upon which their opinions are based, and for good cause shows the following:

1.	DAVID PEDDER, JR. expects the state to rely upon expert witnesses to prove its case.

2.	The burden of establishing the admissibility of an expert's opinion rests on the party offering the evidence.

3.	Whether the proffered witness possesses the requisite qualifications is a preliminary matter for the trial court to decide and not a matter of weight only to be determined by the jury.

4.	The party offering such evidence also bears the burden of establishing its relevance, and that its probative value outweighs its prejudicial potential.

.5.	DAVID PEDDER, JR. requests a hearing on the preliminary question concerning the expert's qualification pursuant to Rule 104(a) of the Texas Rules of Evidence.

6.	In addition to the Rule 104(a) hearing, DAVID PEDDER, JR. is entitled to a voir dire examination out of the hearing of the jury "directed to the underlying facts and data upon which the opinion is based." *See* Texas Rules of Evidence 705(b).

**WHEREFORE, PREMISES CONSIDERED,** DAVID PEDDER, JR. respectfully prays that this Honorable Court grant this motion and order a voir dire hearing pursuant to Texas Rules of Evidence 104(a) and 705(b).

Respectfully submitted,

BRUCE N. SMITH
ATTORNEY AT LAW
2750 IH-10 E
Beaumont, Texas 77703
(409) 899.1046
(409) 899.2648 Fax

By: _____
BRUCE N. SMITH
State Bar No.18543300
Attorney for DAVID PEDDER, JR.

## CERTIFICATE OF SERVICE

This is to certify that on November 14, 2011, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, ORANGE County, by hand delivery.

_____
BRUCE N. SMITH

## ORDER FOR A SETTING

On _____, 2011, the Defendant filed a Motion for Voir Dire of Expert Witness. The Court finds that the party is entitled to a hearing on this matter, and it is THEREFORE ORDERED that a hearing on this motion is set for _____, at _____.

Signed on _____.

_____
JUDGE PRESIDING

NO. A100640-R

| STATE OF TEXAS | § | IN THE 260TH JUDICIAL DISTRICT |
|---|---|---|
| | § | |
| vs. | § | COURT OF |
| | § | |
| DAVID PEDDER, JR. | § | ORANGE COUNTY, TEXAS |

## ORDER

On _____, 2011, came on to be considered DAVID PEDDER, JR.'s

Motion for Voir Dire of Expert Witness, and said motion is hereby

(Granted)   (Denied)

_____
JUDGE PRESIDING

NO. A100640-R

| STATE OF TEXAS | § | IN THE 260TH JUDICIAL DISTRICT |
|---|---|---|
| | § | |
| vs. | § | COURT OF |
| | § | |
| DAVID PEDDER, JR. | § | ORANGE COUNTY, TEXAS |

## MOTION FOR WITNESS LIST

**TO THE HONORABLE JUDGE OF SAID COURT:**

Now comes DAVID PEDDER, JR., Defendant, and files this Motion for a List of Witnesses and seeks production of the items requested hereinbelow relating to witnesses to be called by the State at any stage of the proceedings in this cause:

1. A list of the names and addresses of all witnesses the prosecution intends to call at any stage of the proceedings in this cause.

2. A list of the names, addresses and professions of all expert witnesses the prosecution intends to call at any stage of the proceedings in this cause, along with each expert's qualifications, the subject and a description of his or her contemplated testimony, and his or her report.

3. Any evidence in possession of the state that any of its witnesses is presently incompetent to testify, or that any of its witnesses has been found incompetent to testify, incompetent, or insane.

4. The criminal record of each witness for the state showing every conviction or probation for felony or misdemeanor involving moral turpitude which is admissible for impeachment under Rule 609 of the Texas Rules of Evidence.

5. The criminal record of each witness for the state showing every event which can be used to impeach the witness including any deferred adjudication probations, arrests, or juvenile adjudications pending against the witness between the time of the offense alleged against Defendant and Defendant's trial.

6. All inducements offered by the state which might tend to motivate its witnesses to testify against Defendant, including, but not limited to, plea bargain agreements, fee, expense, or reward arrangements, agreements to dismiss or reduce or not bring charges, or any other agreement

of leniency.

7. All writings used to refresh the recollection of any witnesses, as provided in Rule 612 of the Texas Rules of Evidence.

8. Any supplementation hereof should be produced no later than 24-hours prior to the trial in this matter. *See* Richardson v. State, 744 S.W.2d 65, 77. (Tex. Crim. App. 1987); Hightower v. State, 629 S.W.2d 920 (Tex. Crim. App. 1981); Young v. State, 547 S.W.2d 23 (Tex. Crim. App. 1977).

9. In support of this motion, Defendant would show that (a) the items requested are in the exclusive possession, custody and control of the State of Texas or the United States Government by and through its agents, the police or the prosecuting attorney's office, and Defendant has no other means of ascertaining the disclosure requested; (b) the items requested are not privileged; (c) the items and information requested are material to this cause and the issues of guilt or innocence and punishment to be determined in this cause; (d) Defendant cannot safely go to trial without such information and inspection, nor can Defendant adequately prepare a defense herein; (e) Defendant's rights will be violated under Article 39.14 of the Texas Code of Criminal Procedure, Article I, Sections 3, 3a, 10, 13 and 19 of the Constitution of the State of Texas, and the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States of America absent such discovery.

**WHEREFORE, PREMISES CONSIDERED,** DAVID PEDDER, JR. prays that the State be ordered to provide said discovery relating to witnesses in this case as requested in this motion.

Respectfully submitted,

BRUCE N. SMITH
ATTORNEY AT LAW
2750 IH-10 E
Beaumont, Texas 77703
(409) 899.1046
(409) 899.2648 Fax


By:_____
BRUCE N. SMITH
State Bar No.18543300


## CERTIFICATE OF SERVICE

This is to certify that on November 14, 2011, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, ORANGE County, by hand delivery.

_____
BRUCE N. SMITH


## ORDER FOR A SETTING

On _____, 2011, the Defendant filed a Motion for Witness List. The Court finds that the party is entitled to a hearing on this matter, and it is THEREFORE ORDERED that a hearing on this motion is set for _____, at _____.

Signed on _____.


_____
JUDGE PRESIDING

NO. A100640-R

STATE OF TEXAS                           §        IN THE 260TH JUDICIAL DISTRICT
                                         §
vs.                                      §        COURT OF
                                         §
DAVID PEDDER, JR.                        §        ORANGE  COUNTY, TEXAS

## O R D E R

On _____, 2011, came on to be considered DAVID PEDDER, JR.'s

Motion for Witness List, and said motion is hereby

(Granted)   (Denied)


_____
JUDGE PRESIDING

NO. A100640-R

| STATE OF TEXAS | § | IN THE 260TH JUDICIAL DISTRICT |
|---|---|---|
| | § | |
| vs. | § | COURT OF |
| | § | |
| DAVID PEDDER, JR. | § | ORANGE COUNTY, TEXAS |

## MOTION FOR DISCOVERY

**TO THE HONORABLE JUDGE OF SAID COURT:**

Now comes DAVID PEDDER, JR., Defendant in the above entitled and numbered cause, by and through undersigned counsel, and makes this Motion for Discovery, and for good cause shows the following:

### I.

### A. WITNESSES

Defendant moves the Court to order the District Attorney to produce and permit counsel for Defendant to inspect the following designated items relating to any witnesses in this case:

1.  A list of the names and addresses of all witnesses the prosecution intends to call at trial.

2.  A list of the names, addresses and professions of all expert witnesses the prosecution intends to call at trial, along with each expert's qualifications, the subject and a description of his or her contemplated testimony, and his or her report.

3.  Any evidence in possession of the state that any of its witnesses is presently incompetent to testify, or that any of its witnesses has been found incompetent to testify, incompetent, or insane.

4.  The criminal record of each witness for the state showing every conviction or probation for felony or misdemeanor involving moral turpitude which is admissible for impeachment under Rule 609 of the Texas Rules of Evidence.

5.  The criminal record of each witness for the state showing every event which can be used to impeach the witness including any deferred adjudication probations, arrests, or juvenile adjudications pending against the witness between the time of the offense alleged against Defendant and Defendant's trial.

6.  All inducements offered by the state which might tend to motivate its witnesses to testify against Defendant, including, but not limited to, plea bargain agreements, fee, expense, or reward arrangements, agreements to dismiss or reduce or not bring charges, or any other agreement of leniency.

7.  All writings used to refresh the recollection of any witnesses, as provided in Rule 612 of the Texas Rules of Evidence.

## B. STATEMENTS

Defendant moves the Court to order the District Attorney to produce and permit counsel for Defendant to inspect the following designated items relating to any statements in this case:

1. All written confessions, admissions and statements, made by Defendant to the state in connection with this case.

2. All oral confessions, admissions and statements, made by Defendant to the state in connection with this case, which have been electronically recorded.

3. The substance of all oral confessions, admissions and statements made by Defendant to the state in connection with this case, which were not electronically recorded.

4. All statements, written or oral, electronically recorded or not, given by Defendant which are exculpatory or which tend to mitigate punishment.

5. All written warnings, admonitions, rights and waivers given by the state to Defendant before Defendant gave any written or oral statements, admissions or confessions or testimony at any examining trial or grand jury hearing.

6. All statements of a nature as would be arguably admissible as a "res gestae" statement, spontaneous statement, or other utterance which the State intends to introduce in its case in chief, either during the guilt/innocence stage, or during the punishment stage.

7. All witness statements as that term is used in Rule 615 of the Texas Rules of Evidence, whether in final, rough, draft, or other form.

## C. WARRANTS AND WAIVERS

Defendant moves the Court to order the District Attorney to produce and permit counsel for Defendant to inspect the following designated items relating to warrants and/or any waivers in this case:

1. The search warrants and affidavits in support thereof obtained by law enforcement authorities to search Defendant's real property, residence, vehicle, effects, papers or person in this case.

2. The arrest warrants and writs of capias, and affidavits in support thereof, obtained by law enforcement authorities to arrest Defendant in this case.

3. The written consent to search Defendant's real property, residence, vehicle, effects, papers or person alleged by the state to have been signed prior to the search and seizure of said property.

4. Any written waiver alleged by the State to have been signed by the Defendant involving the Defendant's right to counsel, the right to remain silent, or the right to be free from search and seizure.

## D. LAW ENFORCEMENT AND INVESTIGATION

Defendant moves the Court to order the District Attorney to produce and permit counsel for Defendant to inspect the following designated items relating to law enforcement and the investigation of this case:

1. Offense reports, police reports, crime scene investigation reports or records or reports of any third parties, by way of written memoranda, letters, notes or transcriptions involving the alleged facts of the offense, the crime scene or any location which may have a bearing on any issue of the case.

2. The name, rank and badge number of any law enforcement officer and any employee of the Office of the District Attorney who participated in any way in the investigation of this case, whether at the scene, in transporting Defendant, at the Police Station, at the jail or elsewhere.

3. The name and address of any person (including any suspects in this case) interviewed by representatives of the State of Texas, whether an employee of a law enforcement agency or of the Office of the District Attorney or otherwise, in connection with this case.

4. All hand-written, typed or otherwise recorded notes of law enforcement officers, relating to any part of this case (such as arrest, investigation, interrogation, interviews, or any other aspect) who investigated or participated in the preparation of this case for trial, enforcement agency or of the Office of the District Attorney or otherwise, in connection with this case.

## E. PHOTOGRAPHIC EVIDENCE

Defendant moves the Court to order the District Attorney to produce and permit counsel for Defendant to inspect the following designated items regarding to photographic-related evidence in this case:

1. All photographs, videotapes, audiotapes, drawings, charts and diagrams made by the state or law enforcement agency with reference to this case, including, but not limited to those of the scene of the crime and the scene of Defendant's arrest.

2. All photographs of the complainant, whether taken at the scene of the alleged offense, at the scene where the complainant was discovered, at the hospital, or at the time of the autopsy, if any.

3. All photographs of suspects which were shown to all witnesses to the alleged offense, concerning the identity of the perpetrator of the offense for which Defendant has been charged.

4. All photographs of Defendant which were used in the investigation of this case, including any photograph which may have been shown by any law enforcement officer to any potential witness in this case.

5. All "mugshots" of Defendant made by the state following his arrest in this case.

6. All photographs of all line-ups conducted in this case, including any line-up in which Defendant participated.

7. All photographs, line-ups, or show-ups presented to any witness in this case, whether or not Defendant was in it, or was identified by the witness.

## F. PHYSICAL EVIDENCE

Defendant moves the Court to order the District Attorney to produce and permit counsel for Defendant to inspect the following designated items relating to physical evidence in this case:

1. All physical evidence seized by the state from Defendant in connection with this case.

2. All physical evidence seized by the state from Co-Defendants, co-conspirators, parties or accomplices, before, during, or after their arrest, in connection with this case.

3. All physical evidence, property, documents, papers, books, accounts, letters, photographs, objects, records or tangible things belonging to Defendant which are now in the possession of the state or its agencies.

4. All physical evidence in possession or control of the state which the state intends to offer at trial in this case.

5. All physical evidence alleged to be the instrumentality of the crime for which Defendant stands indicted.

6. All physical evidence removed by the state from the scene of the alleged crime.

7. All weapons in possession or custody of the state, alleged to have been used by Defendant, Co-Defendants, co-conspirators, parties, accomplices, complainants or witnesses in this case, including ammunition, shells, cartridges, bullets, slugs, wadding, projectiles, missiles, and fragments recovered from the scene or any person.

8. All blood samples, bodily fluids, tissues or hair samples taken from the scene of the alleged crime or from the person of DAVID PEDDER, JR., or the home or vehicle of DAVID PEDDER, JR. or from any complainant or witness.

9. All contraband including drugs, controlled substances, and/or paraphernalia which was seized as a result of the investigation of this cause, in order to permit counsel for Defendant an opportunity to examine the same and to have an expert examine, test and inspect the same.

10. The location from which each piece of physical evidence was found, the time it was found, and the name of the person who found it.

11. All other physical evidence, property, documents, papers, books, accounts, letters, photographs, objects, tangible things or records which constitute or contain evidence

material to any matter involved in this case which are in the possession, custody or control of the state or any of its agencies.

## G. TESTS, REPORTS AND SCIENTIFIC EVIDENCE

Defendant moves the Court to order the District Attorney to produce and permit counsel for Defendant to inspect the following designated items relating to tests, reports and any other scientific evidence in this case:

1. All latent fingerprints, palm prints, foot prints, tire tracks or tool marks and reports generated with respect to said prints, discovered by the state which are material to the commission of the crime for which Defendant has been charged.

2. All reports of scientific tests, experiments and comparisons, and the name of each person who made such report or performed such tests, experiments or comparisons, including, but not limited to, DNA, hair, drugs and controlled substances and fingerprints.

## H. STATE EVIDENCE

Defendant moves the Court to order the District Attorney to produce and permit counsel for Defendant to inspect the following designated items relating to State's evidence in this case:

1. All evidence in possession of, or within the knowledge of, the state or any of its agencies, including impeachment evidence, which is favorable to Defendant and material either to guilt or to punishment.

II.

In support of this motion, Defendant would show that: (a) the items requested are in the exclusive possession, custody and control of the State of Texas or the United States Government by and through its agents, the police or the prosecuting attorney's office, and Defendant has no other means of ascertaining the disclosure requested; (b) the items requested are not privileged; (c) the items and information requested are material to this cause and the issues of guilt or innocence and punishment to be determined in this cause; (d) Defendant cannot safely go to trial without such information and inspection, nor can Defendant adequately prepare a defense herein; (e) Defendant's rights will be violated under Article 39.14 of the Texas Code of Criminal Procedure, Article I, Sections 3, 3a, 10, 13 and 19 of the Constitution of the State of Texas, and the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States of America by such absent such discovery.

**WHEREFORE, PREMISES CONSIDERED**, Defendant respectfully prays that this Honorable Court will grant this Motion for Discovery in all things.

Respectfully submitted,

BRUCE N. SMITH
ATTORNEY AT LAW
2750 IH-10 E
Beaumont, Texas 77703
(409) 899.1046
(409) 899.2648 Fax

By: _____
BRUCE N. SMITH
State Bar No.18543300
ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

This is to certify that on November 14, 2011, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, ORANGE County, by hand delivery.

_____
BRUCE N. SMITH

## ORDER FOR A SETTING

On _____, 2011, the Defendant filed a Motion for Discovery. The Court finds that the party is entitled to a hearing on this matter, and it is THEREFORE ORDERED that a hearing on this motion is set for _____, at _____.

Signed on _____.

_____
JUDGE PRESIDING

NO. A100640-R

| STATE OF TEXAS | § | IN THE 260TH JUDICIAL DISTRICT |
| | § | |
| vs. | § | COURT OF |
| | § | |
| DAVID PEDDER, JR. | § | ORANGE  COUNTY, TEXAS |

## O R D E R

On _____, 2011, came on to be heard Defendant's Motion For Discovery, and after hearing same, the Court orders discovery as indicated in the body of the motion.

_____
PRESIDING JUDGE

NO. A100640-R

| STATE OF TEXAS | § | IN THE 260TH JUDICIAL DISTRICT |
| vs. | § | COURT OF |
| | § | |
| DAVID PEDDER, JR. | § | ORANGE COUNTY, TEXAS |

## MOTION FOR DISCOVERY OF PUNISHMENT EVIDENCE

**TO THE HONORABLE JUDGE OF SAID COURT:**

Now comes DAVID PEDDER, JR., Defendant, and moves the Court to order the State's attorney to disclose the following as they relate to the punishment hearing in this cause:

1. The names and locations of any witnesses that the State intends to call to testify about DAVID PEDDER, JR.'s propensity for violence or that he poses a continuing threat to society.

DAVID PEDDER, JR. alleges that the requested information is within the possession or control of the State of Texas or its agents. Other than discovery by these means, DAVID PEDDER, JR. has no other means by which to obtain the information requested, which is necessary for the proper preparation of the defense of this cause in the punishment hearing.

**WHEREFORE, PREMISES CONSIDERED,** DAVID PEDDER, JR. respectfully prays that the Court grant this motion.

Respectfully submitted,

BRUCE N. SMITH
ATTORNEY AT LAW
2750 IH-10 E
Beaumont, Texas 77703
(409) 899.1046
(409) 899.2648 Fax

By:_____
BRUCE N. SMITH
State Bar No.18543300
Attorney for DAVID PEDDER, JR.

## CERTIFICATE OF SERVICE

This is to certify that on November 14, 2011, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, ORANGE County, by hand delivery.

_____
BRUCE N. SMITH

## ORDER FOR A SETTING

On _____, 2011, the Defendant filed a Motion for Discovery of Punishment Evidence. The Court finds that the party is entitled to a hearing on this matter, and it is THEREFORE ORDERED that a hearing on this motion is set for _____, at _____.

Signed on _____.

_____
JUDGE PRESIDING

NO. A100640-R

| STATE OF TEXAS | § | IN THE 260TH JUDICIAL DISTRICT |
| | § | |
| vs. | § | COURT OF |
| | § | |
| DAVID PEDDER, JR. | § | ORANGE  COUNTY, TEXAS |

## O R D E R

On _____, 2011, came on to be considered DAVID PEDDER, JR.'s

Motion for Discovery of Punishment Evidence, and said motion is hereby

(Granted)   (Denied)


_____
JUDGE PRESIDING

AA

Affidavit of Leroy Perkins

The State of Texas

County of Orange

BEFORE ME, the undersigned authority on this day personally appeared Leroy Perkins, of Orange, Orange County, Texas, hereinafter called "Affiant", who after by me being first duly sworn did depose and say as follows:

"My name is Leroy Perkins. I haul scrap metal away from Baker's Transmission and have done this for approximately five years. I generally go by Baker's Transmission once a week. In the approximately five years I have been hauling scrap metal, I have never been by the shop during business hours when there was not at least one family member present and there was almost always more than one family member present. I have also been to Baker's Transmission on several occasions, in the morning, when there were employees in the parking lot waiting for Don Freeman or one of the family members to come and open the business. From my observation, no employee could enter the business until Mr. Freeman or a member of his family appeared and opened the business. I knew that there was no reason for me to go to Baker's Transmission to haul scrap metal until after 7:30 a.m. and closer to 8:00 a.m. because there was no way I could access the building without Mr. Freeman or a family member being present and having opened the business. "

EXECUTED this the 15ᵗʰ day of June, 2015.

_____
Affiant

SUBSCRIBED AND SWORN to before me by the said Leroy Perkins, on this the 15ᵗʰ day of June, 2015.

DEANA AYLOR
MY COMMISSION EXPIRES
August 26, 2015

_____
Notary Public in and for the
State of Texas



EXHIBIT

AA

BB

Affidavit of Eric Wolfford

The State of Texas

County of Orange

BEFORE ME, the undersigned authority on this day personally appeared Eric Wolfford, of Orange, Orange County, Texas, hereinafter called "Affiant", who after by me being first duly sworn did depose and say as follows:

"My name is Eric Wolfford. I have been an employee of the City of Orange for approximately twenty-four years. My job is to maintain the entire fleet equipment that would include police cars, fire trucks, tractors, and all other vehicles. I have done business with Baker's Transmission through the city for approximately twenty years. I would deliver and pick up vehicles and equipment that needed transmission repair work and this was often done by Baker's Transmission. I would also frequently drive by Baker's Transmission on weekdays and weekends. I have known Don Freeman for at least twenty years and his family and have become familiar with the vehicles that they drive. There is always one or more family member at the shop and if not, the shop is closed. I can always tell whether or not Baker's Transmission is opened or closed based upon whether or not at least one family members' vehicle is on the premises."

EXECUTED this the _15_ day of _June_, 2015.

_Eric Wolfford_
Affiant

SUBSCRIBED AND SWORN to before me by the said Eric Wolfford, on this the _15th_ day of _June_, 2015.

DEANA AYLOR
MY COMMISSION EXPIRES
August 26, 2015

_Deana Aylor_
Notary Public in and for the
State of Texas

EXHIBIT
_BB_

CC

Affidavit of Dr. Robert Marroquin

The State of Texas

County of Orange

BEFORE ME, the undersigned authority on this day personally appeared Dr. Robert Marroquin, of Orange, Orange County, Texas, hereinafter called "Affiant", who after by me being first duly sworn did depose and say as follows:

"My name is Dr. Robert Marroquin. I have done business with Baker's Transmission from approximately 1984 to date. I estimate that I have gone to Baker's Transmission at least twelve times per year since 1984 for mechanic work. In addition, I go to Baker's Transmission for social or diagnostic questions on my vehicles at least ten times average per year since 1984. I have never been to Baker's Transmission during business hours when at least one family member is on the premises. I have also been to Baker's Transmission in the morning prior to them opening and have waited in the parking lot with employees until Don Freeman or a family member appears on the premises to open the business. I have also been with Don Freeman on several occasions when he is the last person leaving and observed him lock the building with no other employees on site or in the shop. It is my firm belief that unless there is a Freeman family member present, the business is closed and locked."

EXECUTED this the _15th_ day of _June_, 2015.

_____
Affiant

SUBSCRIBED AND SWORN to before me by the said Dr. Robert Marroquin, on this the _15th_ day of _June_, 2015.

DEANA AYLOR
MY COMMISSION EXPIRES
August 26, 2015

_____
Notary Public in and for the
State of Texas

EXHIBIT
CC